Melvin J. CORMIER, et al.

v.

P. P. G. INDUSTRIES, INC. and Local 470 of the International Association of Machinists and Aerospace Workers.

Civ. A. No. 751320.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

June 18, 1981.

Etta Kay Hearn, Baton Rouge, La., Mark T. McDonald, Houston, Tex., for plaintiffs.

Robert K. McCalla and Keith M. Pyburn, Jr., McCalla, Thompson, Pyburn & Ridley, New Orleans, La., Oliver P. Stockwell and Fred H. Sievert, Jr., Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, La., for defendants P.P.G. Industries, Inc.

Robert T. Jacques, Drewett, Jacques & Thomas, Lake Charles, La., for Local 470, International Ass'n of Machinists and Aerospace Workers.

## OPINION

VERON, District Judge.

This class action was brought under the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C., Section 2000e, et seq. (Title VII) and under 42 U.S.C. Section 1981.

The court bifurcated the trial and tried the question of liability, leaving the damage question to be decided later, depending on the outcome of the question of liability.

Plaintiffs are black employees employed at the chemical plant operated by PPG Industries, Inc., in Lake Charles, Louisiana. On June 13, 1977, this Court defined the class of plaintiffs as follows:

(1) All present and former black employees employed as of or at any time after October 21, 1974, by PPG Industries, Inc., at its Lake Charles Chemical Plant located on Columbia Southern Road near Lake Charles, Louisiana, in any maintenance or production department job classification covered by the collective bargaining agreement in effect or which at any material time has been in effect between Defendant PPG Industries, Inc. and Local 470 of the International Association of Machinists and Aerospace Workers, (2) All present and former black employees employed as of or at any time after October 21, 1974 by PPG Industries, Inc., at

its Lake Charles Chemical Plant located on Columbia Southern Road near Lake Charles, Louisiana, in any job classification or position not covered by the collective bargaining agreements in effect or which at any material time have been in effect between Defendant PPG Industries, Inc. and Local 470 of the International Association of Machinists and Aerospace Workers.

Defendant, PPG Industries, Inc., (hereinafter PPG) is a diversified company engaged in the operation of the chemical plant involved in these proceedings.

Defendant, Local 470, International Association of Machinists, (hereinafter Local 470) is a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5), and represents the hourly employees in the production and maintenance jobs at the Lake Charles, Louisiana plant.

PPG is engaged in the manufacture of basic chemicals and chemical compounds, including chlorine, vinyl chloride, EDC, triethane, etc., through highly intricate and sophisticated procedures of breaking down and combining various chemicals. These chemicals are exceedingly hazardous. Many of the chemicals are highly volatile and explosive.

There were extensive pretrial proceedings in this case with ample opportunity for discovery and for the proper formulation of issues.

The following issues were pursued by the plaintiffs:

a. Whether the defendants discriminated against blacks in hiring and job assignment.

b. Whether the defendants unlawfully used tests to discriminate against blacks.

c. Whether the defendants instituted and/or maintained an unlawful seniority and transfer system that is not bona fide and/or had its genesis in racial discrimination.

d. Whether the defendants discriminated against blacks by denying them promotion to supervisory positions.

e. Whether defendants discriminated against blacks by failing or refusing to assign them to clerical, technical and/or craft jobs.

f. Whether defendants discriminated against blacks by denying them training on an equal basis as whites and requiring blacks to train whites who were then promoted to higher paying and more desirable jobs.

g. Whether defendants discriminated against blacks by paying them lower wage rates for performing essentially the same jobs as whites.

h. Whether defendants discriminated against blacks by discharging them unlawfully.

i. Whether defendant Local 470 has discriminated against blacks by failing to properly represent them without regard to their race or color.

At the close of the plaintiffs' case both defendant PPG and defendant Local 470 filed a number of motions to dismiss certain issues and to redefine the scope of the class.

The court, for the reasons stated in its March 26, 1980 ruling, which are hereby adopted as findings of fact, decertified the plaintiffs as proper representatives of the sub-class of black employees not covered by the union contract as described in the original certification order dated June 13, 1977.

Only one of the named plaintiffs, Mr. Noah Lewis, was a member of this second sub-class. Plaintiffs were permitted to proceed with litigation of Mr. Lewis' individual claim.

The court also dismissed plaintiffs' allegation that Local 470 had failed to represent them without regard to their race or color. This ruling was based on the fact that a number of plaintiffs, and other black witnesses called on behalf of the plaintiffs, testified that representatives of Local 470 repeatedly responded to their grievances and complaints and assisted them in obtaining action from the company.

Plaintiffs in this case offered over forty employee witnesses. The testimony of

these witnesses consisted almost entirely of opinion evidence. The plaintiffs repeatedly testified about things they "felt" or "believed" to be discriminatory. However, they offered little if any credible factual information to support this allegation.

The court also notes that there was almost a total absence of allegations of any overt racial harassment or other overt discrimination which occurred at the plant at anytime.

## TIME PERIOD COVERED BY THIS ACTION

The earliest EEOC charge filed by an individual named plaintiff was on April 18, 1975. (Pl. Exh. 1). One hundred and eighty days preceding April 18, 1975 is October 21, 1974.

Under the provisions of Title VII, an alleged illegal act by the Company is not timely and actionable unless it occurred on or after October 21, 1974. However, the court allowed plaintiffs to present testimony concerning incidents which occurred substantially before this period of time and received statistics for a five year period before this date in order to allow plaintiffs to attempt to show a pattern or practice of discrimination leading up to and continuing into the period covered by this suit.

Additionally, to the extent plaintiffs challenged the seniority system, plaintiffs were permitted to introduce evidence relevant to that issue without any time limitation.

## THE CONTRACTUAL SENIORITY SYSTEM

Employees in jobs covered by the collective bargaining agreement are presently classified into 15 separate department or lines of progression. Employees enter these departments through one of two entry pool job classifications. Employees who qualify for the utility crew by passing two job related tests are eligible to go into the skilled power generation, chlorine—caustic production, organic (Plant B) silica, lead loader and maintenance lines of progression. Other employees, hired into the yard utility crew are eligible to enter the diaphragm, mercury, and glanor cell repair,

pigments packer, pels shipper, and yard lines of progression. The system is depicted on pages 35 and 36 of Joint Exhibit 16.

Employees within each line of progression are promoted based on the amount of time they have spent within the department. Absent special circumstances employees are not allowed to transfer from one department to another. Employees are allowed to transfer from the yard utility crew to the utility crew, however, if they qualify for this position by passing the required tests.

To properly understand the development and operation of this departmental seniority system, it is necessary to review in detail the history of the system and the factors which were considered in structuring the system.

The plant commenced operations during 1947. At that time it was owned by Southern Alkali Corporation, a separate corporation, owned in part by PPG and American Cyanamid Company. It was purchased by PPG in 1951 when its name was changed to Columbia Southern Chemical Corporation. Approximately one year earlier Southern Alkali Corporation employed an experienced labor relations director, Mr. Clem White.

Mr. White was responsible for formulating and implementing labor relations policies for the new plant, including the determination of what job classifications would be created and how they would be organized into departments and progression lines. To insure the labor relations policies were developed in an orderly and systematic way, Mr. White wrote a twelve chapter book describing in detail the recommended steps he would follow in developing the labor relations policies.

In order to decide what job classifications should be created and how they should be organized into departments and progression lines, Mr. White recommended an analysis of the functions to be performed at the plant, a listing of the duties to be performed by employees with a detailed listing of the complexities and risks involved in the performance of those duties. Pursuant to

the written procedures, Mr. White analyzed the functions to be performed at the plant, the duties employees would be expected to perform, and the complexity of those duties and risks of personal injury or damage to the equipment and processes if the duties were improperly performed.

In this connection, he interviewed·supervisors employed by the company and experienced in the operation of a chemical plant similar to the one being constructed at Lake Charles. He also reviewed the proposed plant layout, kinds of equipment, and investigated the hazards involved in the chemical processes and electrical power generating facilities.

Mr. White also visited an existing plant producing the same type of chemicals with similar processes at Natrium, West Virginia and ·studied the job classifications, departments and progression lines at that facility.

˙After this detailed analysis, Mr. White recommended the creation of certain job classifications to be organized into the following departments and progression lines: (1) Production Department, (2) Power Department, (3) Shipping Department, (4) Maintenance Department, and (5) Labor Department.

Mr. White's study and analysis of the equipment, functions, and expected employee duties involved with producing the chlorine gas and caustic soda convinced him the following job classifications should be created and organized into a separate production department as follows:

Based on his investigation of the equipment, functions and employee duties involved with ·operation of the large boilers and turbines used to generate the huge

amounts of electricity needed to make chlorine gas and caustic soda and to otherwise operate the plant, Mr. White recommended the following classifications should be included in a separate progression line as follows:

Department Line

This recommendation was based on Mr. White's conclusion that all of the jobs were to be performed in a separate identified area of the plant complex and were all closely related and involved with operation of the equipment used to produce electricity. Further, it was based on his conclusion that the jobs were highly skilled and would require the frequent exercise of judgment, that if exercised improperly, could lead to wide-spread serious injury and death to the employees and could result in the destruction of equipment and the long term cessation of operations of the plant. The jobs

were to be performed without close continuous supervision and would require extensive training, usually three to five years, before an employee would be competent to perform the higher level jobs in the progression line.

Mr. White's study and analysis of the equipment, functions and employee duties involved with shipping the chlorine gas and caustic soda convinced him the following jobs should be created and included in a separate progression line as follows:

Department Line 11–A

This recommendation was based on Mr. White's conclusion that all of the jobs involved with shipping chlorine gas and caustic soda were closely related and involved operations of similar types of pumps and other pieces of equipment. Further, it was based on Mr. White's conclusion that the jobs were highly skilled, and required the frequent exercise of judgment, that if exercised improperly, could lead to wide-spread serious injury and death to employees and to the public generally while the chlorine

gas was in transit. It was further based on his conclusion that the jobs were to be performed without close continuous supervision, and it would usually take three to five years before an employee would be competent to perform the higher level jobs in the progression line.

Starting with the bottom jobs, the job classifications at each level and the progression lines in the Production Department, Power Department and Shipping Department were designed to provide necessary training to enable the employee to handle the increased complexities and responsibilities required in the next higher job in the progression line.

Based on his detailed analysis of the functions and job duties and his years of experience in labor relations, Mr. White concluded such a step by step progression of employees so as to provide training on the increased complexities of the jobs at each higher level in the progression line was essential for the safe and efficient operation of the plant.

Pursuant to this, he designed a promotional system under which employees would enter the bottom job and promote to each higher job in the progression line based on his length of service in the progression line.

Under the foregoing circumstances and particularly the very hazardous nature of the jobs and the considerable risk of explosion and injury to employees and destruction of equipment, we find the promotional system is essential to the safe and efficient operation of the chemical plant.

Based on his investigation, Mr. White recommended a separate department and progression line be created with the following job classifications to perform the maintenance and repair functions on the machinery and equipment at the plant:

Mr. White concluded that in order to effectively accomplish the maintenance objectives on all of the various types of turbines, pumps, and instrumentation in the plant, they would need skilled craftsmen with perfected skills in the following craft areas: carpenter, electrician, heavy equipment operator, rigger, machinist, painter, pipe fitter, and welder.

However, he specifically recommended a craftsman should not be limited to performing only his craft skill, but would be required to perform all types of maintenance work. Mr. White felt that because there would never be a constant volume of a particular type of craft work, such as electrical work, if employees were limited to performing work in their particular craft skill, depending upon the volume of work, either they would have insufficient work or other essential maintenance functions would not be accomplished.

Accordingly, all skilled craftsmen were classified as service mechanics and were expected to work in teams to perform whatever maintenance work needed to be accomplished.

The general service helper job in the maintenance department progression line was designed as a job untrained employees would go into and, by working along with the skilled craftsmen, over a period of years would learn a craft skill.

Mr. White concluded these jobs should be created and included in a separate progression line because they were closely related and all involved performing the maintenance functions in the plant; were highly skilled, required many years of training, were to be performed without close continuous supervision, and frequently required the exercise of judgment, that if exercised improperly, could result in the serious injury and death to many employees and damage or destruction to equipment and the chemical processes.

Because of the highly skilled and hazardous nature of the jobs, the considerable risk to the safety of other employees and in some cases the public generally, as well as the risk of substantive damage to the equipment and chemical processes, Mr. White recommended and subsequently implemented requirements that all employees going into the Production Department, Power Department, Shipping Department and Maintenance Department undergo extensive screening procedures to determine if they had the qualifications to learn to perform the skilled jobs.

He testified without contradiction that it was not feasible to hire employees for these skilled jobs randomly off the street. In addition to the considerable cost involved with each turnover, the discharge of unsuitable employees, wasted training efforts, and administrative hiring burdens caused by the increased need for new employees; and because of the extended training time, there was a substantial risk employees may perform satisfactorily up to a certain level in the progression line but be incapable of performing any higher level jobs. If the employee were performing satisfactorily at his present level and could not be discharged this would result in clogging the progression of jobs and removing essential steps in the training process designed by

Mr. White. Further, it could leave the company without adequate trained personnel to operate the plant.

To prevent the serious adverse consequences of random selection, the screening procedures included a thorough review of the applicant's prior work history, an investigation of the applicant's experience with prior employers, structured interviews designed to elicit information about the employee's ability to perform the jobs, and paper and pencil tests designed to determine whether the applicant had substantial mental abilities sufficient to perform the higher level and more complex jobs in the plant.

The company retained Dr. Baker, Head of Industrial Psychology at the University of Texas, to advise them about what tests should be adopted. After an investigation of the jobs at the plant Dr. Baker recommended the use of a mechanical aptitude test and the Otis Test which was widely used by industry and also the Armed Forces.

Shortly after, based on the recommendations of Dr. Tydlaska, an Industrial Psychologist from the University of Texas, the company began using the Bennett Mechanical Aptitude Test to screen applicants for the skilled jobs. Since that time, all applicants, other than skilled craftsmen with four or more years of demonstrated journeymen craft skills, for jobs in the skilled progression lines have been required to pass the Bennett Mechanical Aptitude Test.

Once an applicant passed this rigorous screening for the skilled jobs he was placed in a utility crew job, a pool of employees from which employees were selected to go into the skilled progression lines.

Based on his analysis and investigation, Mr. White concluded there should also be a pool of unskilled employees to perform miscellaneous menial laboring type jobs such as clean-up, mowing the grass, and other similar jobs. Accordingly, he recommended the creation of a job classification called "yard labor."

He concluded this should be a separate job classification and should not be included in any of the departments containing the skilled jobs because the work was unskilled repetitive type work that could normally be learned in a few days and did not involve the exercise of any significant judgment that if performed improperly, would result in injury to a large number of employees or substantial damage to the equipment or chemical processes. Further, his investigation revealed this work was not meaningfully related to the work in the skilled progression lines and would not provide any meaningful training for the skilled jobs. He concluded, and we find the evidence establishes business considerations dictate, that these unskilled jobs should not be placed in the skilled progression lines.

His decision to create the yard labor job as a separate job and to not include it in the skilled progression lines was based in part on the fact that the Natrium, West Virginia plant he visited had a separate yard labor job classification to perform these unskilled type functions. At the West Virginia plant the yard labor job was held by white employees.

For similar reasons, Mr. White recommended the creation of a separate loader laborer job. The employees in the loader laborer job are primarily responsible for cleaning out and preparing for shipment the tank cars used to transport caustic soda. Although the job title was changed in 1977 to Caustic Rack Helper, the duties remained the same.

Based on his investigation, Mr. White concluded there should be a separate job classification for this work that should not be included in the departments containing the skilled jobs because the loader laborer work was unskilled repetitive type work that normally could be learned in a few weeks, did not involve the exercise of any significant judgment that if performed improperly would result in serious injury to employees or damage to the equipment or chemical processes, was not meaningfully related to work in the skilled progression line and would not provide meaningful training for the skilled jobs.

Mr. White's recommendation was based in part on the fact that the Natrium, West Virginia plant he visited had a separate loader laborer job classification to perform these similar unskilled functions on the railroad cars used to transport caustic soda. At the West Virginia plant this job was held by white employees.

Plaintiffs claim the job was created as a separate job and excluded from the Shipping Department based on racial considerations. However, the evidence fully establishes and we find the job was created and placed in the unskilled Labor Department based on the sound business considerations discussed above and that racial considerations were not involved in the decision.

Based on his investigation, Mr. White also recommended the creation of the jobs of renewal man, cut-out laborer, and cell renewal laborer and their organization into a separate progression line as follows:

He concluded these should be created and included in a separate progression line from the departments containing the skilled jobs because the work in each of these jobs involved repair work on the cells and was related, but was relatively unskilled, repetitive type work that could normally be learned in a few months, did not involve the exercise of any significant judgment that if exercised improperly would result in the injury to a large number of employees or extensive damage to the chemical processes or significant portions of equipment. Further, he concluded the duties of those jobs were not significantly related to the types of skills and duties performed by employees in the skilled progression lines and would not provide any meaningful training for the skilled jobs.

This conclusion was based in part on the existence of similar jobs classifications organized in a separate progression line at the Natrium, West Virginia plant. At the West Virginia plant these jobs were held by white employees.

Plaintiffs claim these jobs were excluded from the Production Department Progression Line based on racial considerations. In support of this, they introduced testimony showing that employees in both progression lines were involved with the Diaphragm Cells used to manufacture Chlorine and Caustic.

The evidence, however, established the duties, skills, and responsibilities of the two groups of jobs were completely different.

The employees in the bottom job, Cell Builders, in the Cell Renewal Progression Line rebuild the Diaphragm Cells. The cells, approximately 5 feet high and 6 feet square, are made of concrete and consist of two major components: the cell top which contains the anodes and the cell bottom which contains the cathode. By the flow of electricity through a solution of brine water, chlorine gas, caustic soda and hydrogen are created. As a result of this electrolytic source the anodes, cathodes and concrete tops and bottoms have to periodically be replaced.

All of the Diaphragm cells are constructed the same and have the same identical parts. Presently, of the approximately 1000 cells, there are two sizes. Other than the size the cells are identical.

The employees in the cell builder job rebuild the cells in an assembly line process. In this process one group of employees in the cell builder job pours cement in the steel molds, another group inserts the anodes and so on.

The jobs are repetitive and unskilled and plaintiffs admitted each of the jobs could be learned in a few days and all of the jobs in the process could be learned in a few weeks.

The employees in this job are not required to exercise any significant judgment, and improper performance of this job does not create a significant risk of injury to employees or destruction of large amounts of company property.

The employees in the next two jobs in the progression line, Cut-out Helper and Renewal man, work as a team to take the cell out of the chemical process area and transfer it to the rebuilding room.

Briefly, these jobs involve connecting a bypass wire around the cell and pulling a switch to cause the electricity to bypass the cell. The cell is then moved with an overhead crane to the rebuilding room. After the cells are rebuilt, they are replaced in the chemical process area and the electricity is again hooked up to the cell.

The tasks performed in each of the approximately one thousand diaphragm cells are identical and the work is repetitive and unskilled. Plaintiffs admit the jobs can be learned in a matter of a few weeks.

Other than the relatively minor discretion involved in insuring the anodes and cathodes do not physically touch each other when the cells are replaced in line in the chemical process area, and being careful not to touch the electrical circuits, these employees are not required to exercise any significant judgment, that if exercised improperly, could result in injury to employees or damage to the equipment or chemical processes.

The Lead Cell Repairman, as the name implies, is a working leadman in the Cell Rebuilding area.

On the other hand, employees in the Production Department are responsible for actually controlling the chemical process through the manipulation of a number of variable factors such as an electrical current, brine content and flow of brine.

The chemical process is monitored and controlled by these employees through extensive instrumentation that registers and controls all of the pumps, valves, heat exchangers, turbines and other machinery involved with the manufacture of chlorine gas, caustic soda and hydrogen.

To control this process the employees in the Production Department Progression Line must understand how the chemistry and how all of the various parts of the process are related to each other.

In order to competently learn to perform the higher level jobs in the progression normally requires three to five years of on-the-job training in conjunction with some formal instruction.

These jobs require the frequent exercise of judgment that if exercised improperly could result in explosions and injury and death through the release of chlorine gas affecting many employees and damage to the chemical processes.

The inclusion of the unskilled repetitive jobs in the Cell Builder—Renewal Progression would destroy the step-by-step training process designed by Mr. White by clogging the progression line and discouraging qualified persons from remaining employed and could result in the unavailability of trained personnel to operate this sophisticated and hazardous chemical process.

The court finds the Cell Builder—Renewal Progression jobs were excluded from the Production Department for significant business reasons and that racial considerations were not involved in the decision.

Because of the unskilled nature of the loader laborer job and cell renewal jobs, Mr. White recommended, and later implemented, procedures so that employees for these jobs would be selected from the employees in the unskilled yard labor job, the pool of employees performing the unskilled laboring type work.

The separate unskilled Labor Department was organized as follows:

Employees going into these unskilled jobs were not required to pass the rigorous screening required of employees going into the skilled progression lines.

Based on his years of experience in labor relations and analysis of the jobs in the proposed plant, Mr. White testified without contradiction, and the court finds, the efficient and safe operation of the plant was significantly furthered by organization of related jobs into separate progression lines and by separating the progression lines into those containing skilled jobs requiring a high degree of judgment and responsibility and those containing unskilled repetitive type jobs, and by imposing more stringent

hiring qualifications for employees being hired for the skilled jobs.

The grouping of jobs into those requiring a high degree of skill and those that do not and establishing different hiring criteria for each group is a logical and efficient way of organizing jobs within the plant.

Although the evidence establishes that after the organization of the progression lines into skilled and unskilled lines was recommended by Mr. White and subsequently adopted by the company, black applicants were only hired into the unskilled jobs; in view of the convincing testimony of Mr. White that the manner in which the jobs and progression lines were organized was because of significant business considerations; the extensive evidence confirming that this organization is necessary for the safe and efficient operation of this plant; and the fact that the decision was based in part on the organization of jobs at the similar Natrium, West Virginia plant where the unskilled jobs were held by white employees; the court finds the jobs were created and organized into these skilled progression lines and unskilled progression lines based on sound business considerations and that racial considerations were not involved in the decision.

Mr. White testified, and the court finds that racial considerations, or the race of employees subsequently hired to fill the jobs, was not a factor in the decision about what jobs would be created or how they would be organized into departments and progression lines and that his decision and recommendations were based solely on the important business considerations described above and not contradicted by plaintiffs.

On September 10, 1948, approximately one year after the plant commenced operations, the employees in the following described bargaining unit voted to have Local 1317 of the International Association of Machinists represent them for purposes of collective bargaining:

All hourly paid production and maintenance employees of Company employed at its Lake Charles, Louisiana, plant excluding clerical office workers, technically trained laboratory employees, plant guards, plant protection firemen, temporary employees ... and all supervisory employees with the authority to hire, promote, discharge, discipline, or otherwise effect changes in the status of such employees, or effectively recommend such acts.

(Joint Exhibit 1, page 4).

All employees in the bargaining unit, white and black, voted in the election and Local 1317 (later changed to Local 470) represented all employees, white and black, for all purposes in negotiations with the company and in processing grievances under the collective bargaining agreement.

At the time of the NLRB election and for a number of years after, the black employees had their own separate local, Local Union 2002, for purposes of internal union affairs.

However, for purposes of negotiations, processing grievances and all other dealings with the company, black employees participated on the Local 1317 negotiating committee and as Local 1317 Union Stewards for processing of grievances and, as required by the National Labor Relations Act, the Company dealt only with Local 1317 as representatives of all employees, white and black.

During the negotiations leading up to the first collective bargaining agreement, the 1949 contract (Joint Exhibit 1), the parties agreed to the departmental and progression line seniority system initially recommended by Mr. White and adopted by the company including the restrictions on transfer from one progression line to another.

Plaintiffs suggest in their proposed findings based on certain portions of the 1966 contract (Joint Exhibit 10) and the 1969 contract (Joint Exhibit 11), that until 1969 the employees in the Labor Department, all of whom were black, did not acquire progression line seniority rights even if they entered the cell builder—cell renewal progression line, whereas employees in the Power, Production, Shipping and Maintenance Department, all of whom were white,

acquired seniority upon entering the progression line.

The evidence, however, establishes that once an employee entered the cell builder—cell renewal progression line, the only progression fed from employees in the yard crew at that time, he likewise acquired seniority in the progression line and was promoted and demoted based on that seniority.

In addition to the testimony at trial, this is borne out by language in the collective bargaining agreement and the seniority lists.

Thus, in the first agreement negotiated in 1949, Joint Exhibit 1, at page 11:

(c) The beginner job in each department will be filled from qualified employees in the utility or yard labor crews in accordance with the established progression schedules. *Employees in the yard labor crew* and utility crew *who have established seniority credit* in accordance with paragraph (f) *will be given preference for higher jobs* when they have a satisfactory merit rating, *according to the progression line.*

(d) *Progression beyond the beginner job* will be on departmental progression lines and *will be based on departmental seniority* credit and satisfactory performance rating according to the merit rating methods now in effect.

(e) All departmental employees are on trial for the first forty-five (45) days of work on any job assignment. An employee who does not satisfactorily complete his trial period may be returned to his former job in the departmental progression line.

(f) In event of curtailment of working forces, the reduction shall be by a reverse operation of the progression procedure in the Production, Power and Shipping Departments. In the event of reduction of forces in the Service Department, lay-offs will be made in accordance with departmental seniority credit within the affected groups. Forces will be reduced in such proportion as the work available justified and from those classifications short of work usually handled by the group.

Pipefitters, machinists, welders, electricians and other mechanics as well as apprentices laid off may use their seniority credit to displace a general service helper who has less departmental service credit. Employees being reduced may be returned to the utility crew or yard labor crew in accordance with the reverse order of the progression schedule.

It was established through testimony that as used in the collective bargaining agreement the term "departmental seniority" was synonymous with "progression line seniority."

Although, as is true with most negotiated collective bargaining agreements, the instant agreement is not a model of clarity and must be interpreted in light of the actual practices, the language certainly suggests that employees in the yard crew would enter the cell builder-cell renewal progression line and would be promoted within the progression line based on seniority.

This was confirmed by testimony and by seniority lists (PPG Exhibit 177a) for the Cell Renewal Department which show seniority dates for employees in the progression line of 1948, 1949, 1950, 1951, 1952 and so on. If, as plaintiffs claim, black employees could not acquire seniority in this progression line prior to 1969, then clearly they could not have seniority dates prior to 1969.

Pursuing this same theme, plaintiffs point to the fact that employees in the pool of unskilled labor type jobs originally called yard labor, and subsequently identified as yard crew, classified and unclassified labor, and yard utility crew, worked in the labor pool for many years but did not receive progression line or departmental seniority until the 1969 contract.

However, as is discussed hereafter, the reason for this is simply that there were no other progression lines being fed by the labor pool until 1969 and these employees were not in a progression line and could therefore not acquire progression line seniority until they were in fact in a progression line.

The court finds that the departmental progression line system originally created based on Mr. White's recommendations was based on sound business considerations and also finds the genesis of the seniority system was not based on racial considerations.

The seniority system adopted by PPG and the union confirmed the progression lines and promotional procedures originally recommended by Mr. White. Under those procedures employees going into the skilled jobs were hired into the Utility Crew and, as need arose, thereafter entered the bottom job in one of the skilled progression lines. Employees would thereafter be promoted to each higher level of jobs in the progression line based on his date of seniority within the line.

Employees going into the unskilled jobs were hired into the Yard Crew and thereafter, as the need arose, entered the cell cut-out and cell renewal progression line. Employees would thereafter be promoted to each higher level job in the progression line based on his date of seniority within the line.

During the first five years of the plant's operation, the job classifications, progression line and promotion system recommended by Mr. White proved to serve the significant business efficiency and safety objectives except in two areas: (1) employees in the Service Helper job in the Maintenance Department were not learning to be skilled craftsmen merely by working with the Service Mechanics and it became apparent a formal apprenticeship training program was necessary; and (2) a separate job needed to be created in the Labor Department for the repetitive work involved in oiling the pumps, engines and similar pieces of equipment.

In the Maintenance Department, based on five years experience, the company concluded an individual could not learn to be a good service mechanic merely by working with a skilled Service Mechanic and that a formal, structured training program was necessary.

To solve this problem the company instituted a formal four year apprenticeship program approved by the United States Department of Labor to train employees to be skilled Service Mechanics and negotiated a separate Service Apprentice job in the Maintenance Department progression line.

The Service Apprentice job was included in the 1952 collective bargaining agreement in the Maintenance Department as follows:

Mr. White testified, and we find, the Service Apprentice job was created and included in the Maintenance Department progression line for sound business reasons and that racial considerations were not involved in the decision.

Based on the company's experience it was also concluded oiling of the equipment must be done in a systematic way and could best be accomplished by having the same employees perform the job each day.

The job had been performed by employees in the yard labor job, and would continue to be an unskilled, repetitive job of put-

ting oil in the machinery according to a set schedule and would not involve the exercise of judgment that if exercised improperly would result in injury or death of employees or significant damage to substantial amounts of equipment or chemical processes.

Accordingly, a separate job called the oiler job was created and was included in the Labor Department progression line as follows:

Employees were selected from the pool of unskilled employees in the yard labor job. A similar separate "dead end" job existed at the Natrium, West Virginia plant where the job was held by white employees.

Other than the addition of a few jobs in the Production Department progression line, caused by the addition of new equipment, the jobs and progression lines remained unchanged until 1960.

From 1960 to the present there have been substantial changes in the size of the plant and a number of new chemical processes involving different techniques and equipment have been added resulting in corresponding changes in the skilled jobs and progression lines.

Although for the most part plaintiffs offered no evidence challenging that the formation of these new skilled jobs and progression lines was based on sound business considerations, they nevertheless challenge how these jobs are organized into progression lines and claim the seniority system is not bona fide.

As detailed below, the evidence fully establishes these new jobs were created and organized into progression lines as new equipment and chemical processes were added in order to safely and efficiently operate these very hazardous chemical processes.

The first significant addition occurred in 1960 when the company completed construction of the equipment used to manufacture an entirely new organic chemical, ethylene dichloride, at the plant.

To operate this new process, two new jobs were created, lead operator and auxiliary operator, and included in a separate line of progression called the EDC Department.

Both of these jobs were highly skilled jobs requiring the regular exercise of discretion and judgment that if exercised improperly created a substantial risk of injury to a large number of employees and damage to the equipment and the chemical processes. Both jobs were involved in operating the equipment and chemical processes used to manufacture ethylene dichloride and were performed in a separate identified portion of the plant complex.

When the new chemical process was commenced in 1960, there were two employees assigned to each shift for a total of nine employees responsible for operating the continuous twenty-four hour, seven-day a week chemical process.

The initial employees for this chemical process were selected from among employees that bid on the job from the other skilled lines of progression and who already had some experience with operation of pumps, valves and other similar types of equipment that would be operated in the new department.

Although plaintiffs have generally claimed the seniority system is not bona fide and was otherwise designed to restrict blacks to certain job classifications, they have not specifically challenged the creation of the separate jobs and their organization into a separate line of progression to operate the ethylene dichloride chemical process. In any event, the court finds the evidence clearly establishes these jobs were created and organized into a separate progression line based on sound business considerations and that race of the employees was in no sense a factor in the company's decision.

Similar to the other skilled lines of progression, the jobs were organized so that the lowest level job provided training to perform the more complex and more difficult duties in the higher level job in the progression line.

During the negotiations leading up to the 1961 contract, the progression line created by the company was included in the contract as follows: (Joint Exhibit 8).

Subsequent to the 1961 negotiations, the company added another operating unit used to manufacture hydrogen chloride to the ethylene dichloride chemical process.

At this same time, the company added an operator classification to the progression line to operate this related but additional operating unit.

In the negotiations leading up to the 1963 contract, the contract was amended to reflect the addition of this new job classification as follows: (Joint Exhibit 9, at page 41).

Department Line

EDC

Lead Operators

Operators

Auxiliary Operators

Plaintiffs offered no evidence which would indicate the addition of this job to the progression line was for any reason other than sound business considerations. The court finds racial considerations were not involved in the creation of this job as its addition to the progression line.

In accordance with the company's initial plans to use ethylene dichloride as a basic chemical to manufacture a number of other related organic chemicals, after the start-up of the ethylene dichloride manufacturing process in 1960, the following additional and related chemical processes were added in the following years: HCL, hydrogen chloride—1963; methyl chloroform (or tri-ethane)—1965; perchloroethylene—1964–1965; trichloroethylene—1964–1965; ethyl chloride—1966; vinyl chloride—1966–1967; vinylidene dichloride—1969–1970; OHC—ethylene dichloride by a different process—1969; the addition of a pollution unit; the addition of a new tri-ethane plant for the manufacture of the chemical by a different process—1978–1979.

In addition, at the time of the trial the company had under construction equipment that will be used to produce additional vinyl chloride and ethylene dichloride.

All of the chemical processes used to produce these various chemicals are closely integrated. The manufacturing process is a continuous twenty-four hour, seven day week process and the by-products from the manufacture of one chemical are the basic chemicals used to manufacture the other chemicals.

The chemical processes used to manufacture all of these chemicals are similar and require the operation of similar types of machinery and equipment. The jobs are performed in a separate identified part of the plant complex.

Because of the substantial expansion of this portion of the plant into these new product lines, a number of new jobs were created and included in what was originally the ethylene dichloride or EDC Department.

Subsequently, the department name was changed to Plant B to more accurately reflect that the chemical processes were not concerned solely with the manufacture of ethylene dichloride.

Starting with the bottom jobs, the jobs were placed in the progression line based on their complexity and level of skill and responsibility required so that the performance at one level of jobs would provide necessary training to perform the more complex and hazardous duties in the next higher level of jobs in the progression line.

Because of the considerable growth in the number of jobs, in the negotiations resulting in the 1979 collective bargaining contract, the jobs were divided into two separate progression lines, called Plant B–1 and Plant B–2.

The progression lines were divided into separate progression lines because the administration of the employees in one progression line became too unwieldy from the standpoint of supervision and training. The number of jobs was too many for one superintendent to effectively supervise.

The equipment and chemical processes in both the Plant B–1 and Plant B–2 progression lines are similar, and the jobs in the two separate progression lines were divided primarily based on their relationship to a particular part of the chemical process and their different physical location within the plant complex.

The jobs were organized within the new progression lines so that each level of jobs provided necessary training in order to perform the more complex and hazardous duties in the next higher level of jobs in the progression line.

Each higher level job requires the employee to have a greater understanding of

how the chemical process operates to produce the chemical compounds, and the employee must exercise increasing degrees of judgment that if exercised improperly would result in increasing risks of personal injury and death to other employees and damage to the equipment or chemical processes. It was clearly established the jobs in these two progression lines are highly skilled and hazardous jobs requiring extensive training of three to five years before employees are competent to perform the higher level of jobs in the progression line. These employees are routinely called upon to exercise judgment that if exercised improperly could result in serious injury and death to a number of employees and destruction of the equipment and the chemical processes.

This was demonstrated by the explosion and resulting death of five employees and destruction of equipment costing the company millions of dollars that occurred as a result of operator error a few years ago. In view of the business considerations, and particularly the very hazardous nature of these jobs and possible injury and death to employees and damage to equipment, the court finds the creation of these jobs and the manner in which they were organized into lines of progression is essential for the safe and efficient operation of these organic chemical processes, and that racial considerations were not involved in the decision.

The court further finds the promotional system created by the company was not in any sense included in the collective bargaining agreement or maintained in successive collective bargaining agreements based on racial considerations and that the system is bona fide.

As a part of the large plant expansion, shortly before the negotiations leading up to the 1969 contract, the company completed a separate plant within the plant complex to manufacture silica pigments, an entirely new product made from molten glass. The product is used in various products, including cosmetics and tires.

To operate this new chemical process the company created the following job classifications and included them in a separate line of progression in a new silica pigments department:

Silica
Pigments

Lead
Operators

Furnace
Operators

Operators

Auxiliary
Operators

The employees in this progression line are responsible for the operation of a large furnace used to produce molten glass at extremely high temperatures and to manipulate the mixture of various chemicals, heat and pressure in order to produce the final product. Through the information recorded and controlled through complex instrumentation, the employees are required to manipulate a number of variables including heat, pressure, flow and mixture of various liquids and chemicals in order to produce the product safely and to the proper specifications.

Testimony clearly established these employees are required to routinely exercise considerable judgment, and that if the judgment is exercised improperly it could

result in injury to employees and destruction of the oven used to produce the glass as well as the entire chemical process.

All of the jobs in the progression line are performed in a separate identified area of the plant complex and relate to operation of the equipment and chemical processes used to manufacture silica pigments.

The jobs are highly skilled, and were organized in the progression line so that starting with the bottom job each job provides necessary training for the more complex and hazardous duties of the next level of jobs in the progression line. It normally takes three to five years to train someone to competently perform the higher level jobs in the progression line.

The new jobs and their organization into the separate silica pigments progression line was agreed to by the union and was included in the collective bargaining contract during the negotiations leading up to the 1969 contract.

Although plaintiffs do not specifically challenge the creation of these jobs and their organization into the separate silica pigments progression line, they do generally challenge the bona fides of the seniority system. The court finds the evidence clearly establishes the jobs in the silica pigments progression line were created on sound business considerations. In view of the fact that improper exercise of judgment by the employees in this progression line could result in losses of millions of dollars to the company, the court finds that the job classifications and the manner in which they have been organized into a separate progression line as well as the promotional procedures are essential to the safety and efficiency of the company's operations. The court further finds that racial considerations were in no way involved in the decision about which jobs should be created and how they should be organized into a separate progression line, and that racial considerations were in no way involved in the negotiations to include the jobs in a separate progression line in the 1969 collective bargaining agreement or any subsequent agreement.

Because of the substantial expansion of the plant, it became apparent during the early 1970's the company would be forced to significantly increase its ability to produce electrical power. To meet these new needs, the company added huge new boilers and turbines to their existing power generating facilities. The boilers are a number of stories high and the turbines are several hundred feet long and are capable of generating enough electricity for five or more cities the size of Lake Charles, Louisiana.

Similar to the existing boilers, turbines and related power generating equipment, although on a larger scale, the new equipment requires a very high degree of skill and judgment to operate.

Through information recorded and controlled through complex instrumentation, operators in the Power Department are required to frequently make judgments about a number of different variables, including steam flows and pressures, air flows, fuel consumption, and the interrelationship with the public utility electrical grid system.

If the employees in these operator positions in the Power Department improperly exercise this judgment, it can easily result in massive explosions and injury or death to many employees and the destruction of equipment. Additionally, loss of the power generating capabilities through such an explosion could result in the inability to operate certain of the chemical processes. For example, one of the basic raw ingredients used to manufacture chlorine gas and caustic soda is electricity and destruction of a portion of the power generating capabilities could severely affect the company's ability to continue these chemical processes. Because of the long time needed to replace a boiler or turbine, normally more than a year, the possible financial losses are enormous to PPG, the employees who would be laid off and to the community.

With the substantial increase in the amount of equipment, prior to the 1977 negotiations the company created a number of new jobs and organized them in a separate progression line and identified the two

separate progression lines as Power Plant A and Power Plant C as follows:

The job classifications in each of the progression lines involve the operation of the equipment used to generate electrical power, steam, compressed air, and high pressure cooling water for the entire plant complex through certain complex instrumentation.

The jobs are divided into the two separate progression lines based on their interrelationship and location of the equipment controlled by the employees in the progression line within the plant complex.

All of the jobs in both progression lines are highly skilled jobs requiring the exercise of considerable judgment that if exercised improperly could result in injury and death to many employees and destruction of equipment and the chemical processes.

Because of the level of skill and responsibility of these employees it takes three to five years to train an employee to competently perform the higher level jobs in the progression line.

The jobs were created and organized within the progression lines so that each level of jobs would provide necessary training to perform the more complex and hazardous duties and greater responsibilities at each successive higher level of jobs in the progression line.

Although plaintiffs do not specifically challenge the jobs created in the Power Department and how they were organized into progression lines, the plaintiffs do generally attack the bona fides of the seniority system.

The evidence clearly establishes, and the court finds, the jobs created and the manner in which they were organized into two progression lines in the Power Department is essential for the safe and efficient operation of the plant and that racial considerations were in no way involved in the decision about which jobs would be created or how they would be organized in the progression lines.

The court further finds that racial considerations were in no way involved in the initial inclusion of these jobs in the collective bargaining agreement or subsequent collective bargaining agreements.

In 1976, the company also completed construction of Plant C, a new plant designed to produce chlorine and caustic through an entirely new type of cell called a glanor cell.

To operate this new chemical process the company created the following jobs and included them in a separate progression line which was included in the 1977 collective bargaining agreement as follows:

Similar to the earlier process, employees in these operator jobs are required to manipulate a number of variables including voltage, current, brine levels and flows,

through information recorded and controlled through complex instrumentation.

The employees must understand the chemical processes and the operation and interaction of the hundreds of valves, pumps, heat exchangers and other types of machinery involved in the process.

The jobs are highly skilled and require the frequent exercise of judgment that if exercised improperly could result in explosion or the release of chlorine gas and injury or death to a number of employees and destruction of equipment and the chemical processes.

All of the jobs in this separate progression line involve the operation of the equipment used to produce chlorine and caustic through the glanor cell process and are located in a separate identified area of the plant complex.

The jobs are organized within the progression line so that starting with the bottom job each level of jobs provides necessary training to perform the more complex, higher skilled and more hazardous jobs at each higher level in the progression line.

In addition to the operator jobs, the company also created two jobs and organized them into a separate progression line to accomplish the repair and rebuilding of these new types of cells as follows:

Glanor Renewal

Glanor Renewal Helper

Similar to the cell builder jobs in the Diaphragm Cell Builder—Renewal Progression Line, the jobs in this progression did not involve operation of the chemical processes and did not involve manipulation of the variables through instrumentation. The glanor renewal jobs involved repetitive, unskilled tasks of taking apart, cleaning and renewing the identical glanor cells.

The jobs required very little skill or judgment and could be learned in a few weeks. These employees were not required to exercise any significant judgment and improper performance of their job did not have the serious widespread consequences of injury to employees or destruction to equipment if performed improperly.

Although plaintiffs argued significant skill is involved with transporting the large glanor cells back to the cell renewal area, the evidence established a special transporting device had been constructed for this purpose that required minimal skill and judgment to operate and employees in the job could seriously damage a cell only by almost intentional carelessness about how they operated the vehicle.

Accordingly, the court finds that these jobs were created and organized into separate progression lines based on sound business considerations and that racial considerations were in no way involved in the decision to create these jobs or progression lines or their subsequent inclusion in or maintenance in the collective bargaining agreement.

The court further finds the organization of the skilled operator progression line as a separate progression line is essential to the safe and efficient operation of the company.

As the plant grew and with the advent of more sophisticated safety equipment and extensive regulation of employee safety

practices by the Occupational Safety and Health Administration, an agency of the Federal Government, during the 1977 negotiations the company and union agreed to move the safety repairman job from the unskilled Labor Department to the Maintenance Department so that new employees going into the job would have to pass the more stringent screening procedures applicable to employees going into the skilled progression lines.

The complexities of the job had increased considerably over the years preceding this change and it was anticipated would increase much more in the coming years. Because of this the company concluded it was essential that future employees performing maintenance of the safety equipment have the same level of aptitude as employees maintaining other equipment in the plant.

Plaintiffs argue this transfer of the safety repairman job from the unskilled labor department to the maintenance department was for racial reasons and proves the way jobs are included within progression lines is arbitrary and grounded on racial discrimination. Plaintiffs introduced no evidence in support of this contention and did not dispute the increasing complexity and responsibility of the job.

The court finds that the transfer of the safety repairman job to the Maintenance Department was for sound business considerations and was not based on racial considerations.

Plaintiffs also point to the transfer of the winch truck operator job in the Maintenance Department to the Labor Department in the 1977 negotiations as evidence that the placement of jobs is arbitrary and based on racial considerations.

A representative for the company during negotiations testified the job was moved because they concluded the skill level of the job was not as high as other jobs in the Maintenance Department, and the risk involved if the job was performed improperly was not as significant as the other jobs in the Maintenance Department.

Although plaintiffs offered some testimony that the job was similar to the heavy equipment operator job in the Maintenance Department, the evidence clearly established this was not true. While the winch truck operator operates a winch truck capable of lifting small pieces of equipment normally less than a ton a few feet off the ground and usually in open spaces, the heavy equipment operator operates a number of different types of large cranes to lift huge pieces of equipment weighing sixty to seventy tons sometimes 70 to 80 feet off the ground. The machinery often must be lifted in areas where the chemical processes are continuing and the lifting must be accomplished within tolerances of less than an inch. The job is exceedingly hazardous and if the employee does not exercise his judgment it can quickly result in explosion and injury or death to many employees and destruction of equipment and the chemical products.

Accordingly, the court finds that there is a significant difference in the level of skill and judgment required of employees in the winch truck operator job and the heavy equipment operator job and that the consequences of improper performance of duties by the heavy equipment operator is significantly greater than the winch truck operator job.

The court does not find it significant that over a period of 30 years the company mistakenly placed one job in a skilled line of progression and decided to rectify the mistake by transferring it to unskilled progression line.

Accordingly, we find the winch truck operator job was transferred to the unskilled labor department progression line for business considerations and that racial consider-

ations were in no way involved in the decision. This conclusion is further supported by the fact that at the time this position was moved both black and white employees occupied the job and performed the job both before and after it was moved.

The primary thrust of plaintiffs' attack on the seniority system is that there is no logical or business reason for the way jobs were created or organized in the unskilled progression lines and that some of the jobs in the unskilled lines were in fact skilled and provided helpful training to perform certain of the skilled jobs and should therefore have been included in the skilled progression line.

With respect to the first point, the evidence establishes quite clearly how the jobs evolved in the labor department. As the plant grew, and there was a larger volume of certain types of unskilled work, such as janitorial work and loading of drums onto rail cars, the same employees from the yard labor pool were assigned to perform the same work each day. When there became a consistent pattern of assigning the same yard crew employees to the same jobs each day the union, during negotiations, would insist these employees were performing more important work than miscellaneous laboring duties and should have a separate job classification with a slightly higher pay rate. The company acceded to these demands and separate unskilled job classifications were created.

As a result of this process, during the negotiations leading up to the 1961 contract the unskilled employees who performed janitorial work were placed in a separate job classification of janitor. Additionally, employees performing essentially the same laboring functions each day were called classified labor and were paid 22½ cents more per hour. To reflect this the progression line chart in the collective bargaining was changed as follows:

The employees assigned to the janitor job were responsible for sweeping floors and similar cleaning work previously done by the employees in the unskilled yard crew. The work was unskilled, did not require the exercise of any significant amount of judgment that if exercised improperly would jeopardize the safety of employees or result in extensive damage to the equipment or chemical processes. The job required only a few days of training.

The evidence clearly establishes the work performed by employees in the janitor job was not meaningfully related to work in any of the skilled lines of progression,

would not provide helpful training to perform any of the skilled jobs, and that inclusion of the job in the skilled progression lines would have serious adverse consequences on the safe and efficient operation of the plant.

Plaintiffs offered no evidence that the janitorial job was created and included in the Labor Department based on racial considerations.

Accordingly, we find the janitor job was created and was included in the Labor Department based on sound business considerations and that racial considerations were not involved in the decision.

For similar reasons, we find the creation of the separate categories "classified labor" and "unclassified labor" were based on sound business considerations and that racial considerations were not involved in the decision.

Employees in the classified labor job performed various miscellaneous unskilled tasks including driving a flat bed truck, painting drums, loading drums onto rail cars, working in the storeroom, fastening the cable to loads for the winch truck, cleaning the gas masks, and oiling and greasing motor vehicles.

This work did not require any significant degree of skill or judgment, could normally be learned in a few days, and the improper performance of these jobs did not involve large risks of serious consequences to the safety of employees or destruction of equipment or the chemical processes.

As the plant continued to grow over the period from 1961 to 1969 a number of the tasks performed by employees in the classified labor job increased in volume and needed to be performed on a more consistent day by day basis. The same employees were assigned to perform these jobs.

This resulted in pressure from the union at negotiations to create separate new job classifications encompassing the identifiable work tasks and to pay employees in these jobs at a slightly higher rate.

As a result of this process, in the negotiations leading up to the 1963 contract, a separate job of garage attendant was creat-

ed and the employees previously in the classified labor group responsible for changing oil and greasing motor vehicles were included in this job.

Again, it was fully established the duties of this job were repetitive and could be learned in a few weeks and did not require the exercise of any significant judgment that if exercised improperly could result in injury to employees and destruction to large amounts of equipment or machinery.

Although plaintiffs claim this job is similar to the work performed by the Service Mechanics in the Maintenance Department, the evidence clearly established otherwise. The Service Mechanics are responsible for completely disassembling and overhauling various types of engines and other machinery and diagnosing mechanical problems and determining proper solutions. Unlike the repetitive, unskilled work done by employees in the garage attendant job, the Service Mechanics were constantly required to make judgments about repair of the complex machinery and equipment. It required an individual between three and four years in the formalized apprentice training program in order to properly learn to perform this job.

Accordingly, the court finds that the garage attendant job was created and included within the Labor Department for sound business reasons and that racial considerations were not involved in the decision.

The court further finds that the duties of that job are not meaningfully related to the duties of the Service Mechanics in the garage and provide no significant useful training for that job.

In the negotiations leading up to the 1966 contract, the list of job classifications and wage rates was amended to change the title "classified laborer" to "general workmen," although the job duties and employees performing the job remained the same.

In the negotiations leading up to the 1969 contract, the classified labor title was abolished and the employees consistently performing the same tasks on a day by day basis were classified into the following spe-

cific job classifications: Truck Driver; Painter Specialist; Pigment Packers; Janitors; Swamper; Safety Repairmen.

As a result of negotiation of the pay rates for these jobs, they were organized within the Labor Department into the following progression line:

YARD

Truck Driver

Paint Specialist

Pigment Packers

Garage Attendant
General Workmen
Janitors
Swamper
Safety Repairman

Although plaintiffs offered no evidence disputing how and why these separate jobs were created and organized into the yard department progression line, they argue it should be inferred that it was done for racial reasons in order to keep the black employees in the yard department because some of the jobs are related to jobs in the skilled progression lines.

As discussed below, the evidence fully established there is no meaningful relationship between the duties in these jobs and any of the jobs in the skilled progression lines. There are very clear differences in the level of skill, judgment and training time required in these jobs as compared to the jobs in the skilled progression lines. In no case would the performance of these jobs provide any significant helpful training to perform any of the skilled jobs. Equally important, the consequences to safety of the employees and public and the possibility of extensive damage to the equipment and

chemical processes was significantly less in these jobs than in the skilled jobs.

When the plant first began operations, Mr. White decided to create a separate department, called a labor department, to perform these repetitive, unskilled tasks drawing in part from the organization of the jobs at the plant in Natrium, West Virginia. He testified, and the court finds, that the inclusion of these duties in the skilled department progression line would have serious adverse consequences on the safety and efficiency of the plant operations.

The court finds this to be equally true when the tasks were broken down into separate job classifications in the 1969 collective bargaining contract.

The court further finds that for the reasons discussed below these jobs were created and were included in the yard department progression line for sound business reasons and that racial considerations were not involved in the decision.

Plaintiffs offered no evidence and made no claim the truck driver or general workman jobs were related to jobs in the skilled progression line. The evidence clearly establishes there is no meaningful relationship. The truck driver is responsible for driving the flat bed truck to deliver supplies and run errands. The general workmen stocks parts in the warehouse.

Plaintiffs did claim the remaining jobs of painter specialist, pigment packer, garage attendant, janitors, swampers and safety repairmen are closely related to jobs in the skilled progression lines and, notwithstanding how the jobs evolved, the company and the union left the jobs in the yard department progression line based on racial considerations.

The court finds this contention to be without merit. A review of the job duties clearly establishes they did not in fact have any significant relationship with and would not provide any significant training for jobs in the skilled progression line.

While plaintiffs claim the duties in the painter specialist job are similar to the

duties of the Service Mechanic who has a primary craft skill of painter, the evidence fully established the job duties and responsibilities are completely different.

Service Mechanics are responsible for accomplishing all of the various types of sophisticated maintenance necessary in a large chemical plant. Employees in this job having a primary craft skill of painter are required to know when and how to apply the many different types of coatings used at the plant, are required to use cutting torches, sand blasting and other equipment in and around the chemical processes, and are required to repair their own equipment.

Improper performance of these duties, such as the incorrect use of the cutting torch around the hundreds of pipes used in the chemical processes could result in an explosion and serious injury to employees and damage to equipment valued in the millions of dollars. In addition to the application of protective coatings, employees in the Service Mechanic job are assigned to work as a team with the other Service Mechanics to accomplish other types of maintenance at the plant.

In order to learn this job employees are required to complete the four year formal apprenticeship program.

This is far different than the yard crew employee assigned to paint drums. The employee works in one location, repetitively applying the same coating on the same item, a drum. There is very little skill, the job can be learned in a few days, and there are no serious consequences if the employee improperly performs the job.

Plaintiffs also claim the duties performed by employees in the Pigment Packers job are related to work performed by employees in the Lead Loader line of progression in the Shipping Department.

The work performed by employees in the Pigment Packers job consists of the operation of a truck similar to a fork lift truck but with a special lifting device to transport drums from the warehouse to the rail car. This job was previously performed by unskilled employees in the yard crew.

The job is repetitive and unskilled and can be learned in a few days. The job is not hazardous and does not require the exercise of judgment that if exercised improperly creates any significant risk of injury or death of employees or substantial damages to equipment or chemical processes.

Although plaintiffs offered some general testimony that since the job involves shipping, the work is therefore related to work in the Lead Loader line of progression in the Shipping Department, they offered no evidence showing the jobs duties were similar or related.

Evidence offered by the company clearly established the skill level, responsibilities, and duties in the Pigment Packers job are completely different from the jobs in the Lead Loader line of progression. Employees in the Lead Loader line of progression have final responsibility for loading chlorine gas in rail cars, trucks and barges and insuring the vehicles are safe and properly secured, with operable safety valves, so that the chlorine gas will not cause hazardous conditions in public areas while in transit. Improper exercise of judgment in these jobs could result in serious injury and death to employees and the evacuation and possible serious injury to the public generally. To competently perform this job requires three or more years of training and employees in the higher level jobs must qualify and pass the tests required in order to become a licensed tankersman by the United States Coast Guard.

Accordingly, the court finds the inclusion of the Pigment Packer job in the yard department was for sound business reasons, that racial considerations were not involved, and that the job is not related to and would not provide useful training for jobs in the Lead Loader line of progression in the Shipping Department.

Plaintiffs also claim the duties of employees in the Swamper job were like the duties of employees in the Service Mechanic job in the Maintenance Department whose primary craft skill is rigger.

The Service Mechanic with craft skills as a rigger works as a team with the Heavy Equipment Operator Service Mechanic to move very large pieces of equipment sometimes in excess of 10 to 15 feet in diameter, often weighing over 100,000 pounds with varying configurations in and out of the operating areas and up to heights of 60 to 80 feet. Frequently, the machinery has to be moved in the operating area while the chemical processes are continuing. Often the moves have to be made within tolerances of less than one inch and under circumstances where the consequences of the improper performance of their duties could easily result in explosion and injury and death of a number of employees and damage to equipment and the chemical processes. Additionally, the Rigger and Heavy Equipment Operator work as a team to perform considerable maintenance work on the many different types of large cranes and other lifting devices at the chemical plant.

On the other hand, the Swamper works with the Winch Truck Operator. He is responsible for fastening the cable to relatively small items, usually less than a few tons. The items are only lifted a few feet off the ground. The work is performed away from the operating areas, does not involve work with close tolerances and there is not the serious risk of severe consequences to the safety of employees or damage to equipment inherent in the rigger Service Mechanic job. Nor does the Swamper perform any maintenance functions on the equipment.

Accordingly, the court finds the Swamper job is significantly different from the Service Mechanic rigger job and that there is no basis to infer racial considerations were involved in the decision to leave the Swamper job in the Labor Department.

The next significant change in the unskilled jobs occurred in the negotiations leading up to the 1973 collective bargaining agreement when, because of the greater production of caustic pels and silica pigments and the more frequent and consistent assignment of employees in the yard crew

to that work, the union and company agreed to create the following additional job classifications: Pels Lead Packer; Pels Packer; Pels Shipper; and Pigments Shipper.

These jobs were included in the yard department as follows:

Plaintiffs did not offer any testimony that these jobs were created or included in the Yard Department based on racial considerations. Nor did they offer any evidence proving these jobs were related to jobs in the skilled progression lines although they did claim since the jobs involved shipping of a product, they should be included in the Shipping Department.

As discussed previously, employees in the Lead Loader line of progression in the Shipping Department have final responsibility for handling the hazardous chlorine gas and by 1969 the added responsibility of handling and loading tri-ethane, perchloroethylene, trichloroethyene, and vinyl chloride, the latter of which is highly flammable and with improper handling can result in the formation of an explosive vapor cloud.

On the other hand, employees in the Pels and Pigments jobs handle inert pels and silica in powder form. The material is not hazardous, and is poured into hopper rail cars or packaged in bags or drums and loaded onto the rail cars with fork lift type

trucks. The job requires no significant skill or judgment and can normally be learned in a few weeks.

We find these jobs were created and included into the Yard Department progression line for sound business reasons and that racial considerations were not involved in the decision.

In the 1973 negotiations the parties also placed the Loader Laborer, Oiler and Truck Driver jobs in a single progression line with other jobs fed by the Yard Crew as follows:

Truck Driver

Oiler

Loader Laborer

Garage Attnd't.
Janitor
Safety Reprmn.
Swamper
Gen. Workman

The jobs were organized into a single progression line as a result of bargaining demands by the union that this be done and in accordance with the normal give and take in negotiations.

Plaintiffs offered no evidence showing a discriminatory purpose. In view of the way the jobs first evolved, and the fact that they are all unskilled jobs fed by the Yard Crew, the court finds no basis to infer a discriminatory purpose from these changes.

In the negotiations leading up to the 1977 collective bargaining agreement, the company created a new job of "Pigment Lead Packer," and changed the name of the "Loader Laborer" job classification to "Caustic Rack Helper."

The company and union further agreed to split the jobs involved with loading of pels and pigments into two separate lines and include the "Pigment Lead Packer" job and "Caustic Rack Helper" job in the progression lines as follows:

Pels Lead
Packer
Caustic
Rack Hlpr.

Pels
Packer

Pels
Shipper

The Pels Lead Packer job is a working leadman type job over the Pels Packer and Pels Shipper jobs and performed the same type of duties. For the reasons previously discussed, the court finds the job was not created or included in this progression line based on racial considerations.

The "Caustic Rack Helper" job was initially created by Mr. White and called a Loader Laborer when the plant first began operating in 1947. For the reasons previously discussed, the court finds the job was created and placed in the Labor Department for sound business reasons and that racial considerations were not involved in the decision.

Nor do we find any basis for concluding changing the job title to Caustic Rack Helper and placement of the job in the Pels Shipper Packer progression line was for ra-

cial reasons. Plaintiffs offered no evidence to show a discriminatory purpose. The job had been in the Labor Department since inception of the plant and its pay rate logically placed it above the Pels Packer job.

Plaintiffs argue a racial motive should be inferred because the duties of the Caustic Rack Helper are not related to the duties of the Pels Packer or Pels Shipper. However, the evidence fully establishes the jobs in the Labor Department and their formation into the progression line evolved over a period of years through negotiations and gradual growth of the amount of these miscellaneous unskilled functions.

As stated previously, at the time the plant commenced operation, as well as presently, business considerations dictated that these unskilled jobs be included in a separate department. We find this consideration applies equally to the Caustic Rack Helper job.

In the negotiations leading up to the 1977 collective bargaining agreement, the company and union also agreed to split the cell renewal progression line into two progression lines as follows:

As reorganized, the employees in the Mercury Cell Progression Line continued to perform the cell cut-out and cell renewal work on the mercury cells, a different type of cell used to manufacture chlorine and caustic which was installed during 1968, and the employees in the diaphragm cell progression line continued to perform the cell cut-out and cell renewal work on the diaphragm cells.

The cell renewal progression line was split into two progression lines primarily at the request of the employees in the progression line because the employees with the greater progression line seniority wanted to exercise this seniority so that they would only have to work in the more desirable mercury cell area.

Plaintiffs did not offer any evidence specifically attacking the splitting of the cell renewal progression line into two separate lines, although they did present evidence from which they argue the employees in the Mercury Cell Renewal progression line, similar to the work involved with renewal of the Diaphragm Cells, is related to the work done by operators in the chlorine—caustic progression line and should be included in that line.

The evidence establishes the contrary. The work performed by employees in the Mercury Cell Renewal progression line, although performed on a completely different type of cell than the Diaphragm cell, is similar in that it is repetitive work requiring little skill or judgment. In most instances all of the jobs can be learned in a few months and it does not require the exercise of significant judgment that if exercised improperly could result in the injury or death to many employees or destruction of large amounts of costly equipment. Nor does this work provide any meaningful training for the operator jobs.

The operators, on the other hand, control the chlorine—caustic manufacturing process through complex instrumentation that records and controls the various aspects of the continuous chemical process. Through this instrumentation and his knowledge of the intricate chemical process the operator is required to control a number of variables such as the electrical current and voltage,

flow of brine water, brine content, and a large number of pumps, valves, turbines and heat exchangers in order to efficiently and safely produce the chlorine, hydrogen and caustic. These employees are frequently required to exercise high levels of judgment that if exercised improperly could cause the injury or death of many employees and the destruction of equipment. It requires three to five years to train employees to competently perform the higher level operator jobs.

Accordingly, the court finds the organization of the cell renewal progression lines as separate progression lines from those responsible for production of chlorine and caustic was based on sound business considerations, that racial considerations were not involved, and that this organization is essential to the efficient and safe operation of the plant.

In their proposed findings and brief, plaintiffs assert racial discrimination exists because black employees have worked in predominantly white departments such as the Production Department, Shipping Department and Maintenance Department, but have not been permitted to accumulate seniority in those departments.

In support of this, they point to how the progression line charts are drawn showing the yard crew and jobs fed by the yard crew in the Service Department, and Pigments and Pels Packer job in the Shipping Department. They further point to earlier contracts containing the identifying numbers and letters 30–A by the oiler job indicating it was in the Shipping Department, and 8–A by the Cell Renewal progression line indicating it was in the Production Department.

The evidence, however, clearly shows that promotions were made within progression lines based on progression line seniority. As the terms are used in the collective bargaining agreement, progression line and progression line seniority are used interchangeably with department and departmental seniority, but they mean exactly the same thing; the amount of time someone has been in that particular progression line.

For the reasons previously discussed the manner in which these progression lines are organized is based on sound business considerations. The evidence further establishes that promotions within these progression lines have been made based on seniority and totally without regard to an employee's race.

Accordingly, to the extent plaintiffs suggest black employees have worked within departments as the term is used in the collective bargaining agreement and have not earned seniority within that department, the record is devoid of any evidence to support plaintiffs' contention.

To the extent plaintiffs suggest the way the progression line charts were drawn proves these unskilled jobs were related and should have been included in the skilled progression lines, for the reasons previously cited about how and why the progression lines were formed, and the differences between the skilled and unskilled jobs, the court finds their contention is without merit.

The progression line charts merely reflected who had ultimate supervision over these employees. In view of the other record evidence about how and why the progression lines were formed and their relationship, the existence of the same ultimate supervision over both skilled and unskilled jobs does not establish that it makes business sense to combine the skilled and unskilled progression lines.

Plaintiffs also claim the following language in the 1969 contract and certain prior contracts prove the seniority system was designed for a discriminatory purpose:

Section 2. The purpose of the Yard and Utility Crews is to provide a pool of workmen from which to select needed replacements for the beginner's job in all departments of the plant. Employees in the Utility Crew remain on trial until such time as they have satisfactorily completed their trial periods on the beginner jobs in a department. Upon satisfactory completion of the initial trial period in a department, such employee shall have

Company service credit or seniority credit accruing from the date of his original employment. Employees in the Yard Labor Crew, upon satisfactory completion of forty-five (45) consecutive days of actual work, will accumulate service credit from the date of their employment.

Section 3. The seniority of an employee entering a department from the Utility Crew shall begin on the day he enters the department provided he satisfactorily completes his trial period.

The court cannot and does not infer a discriminatory purpose from this language. The language, on its face, is applicable to all employees and employees going into the yard and utility crew are given seniority dates from their initial date of employment if they successfully complete the probationary or trial period. The only difference is that employees in the yard crew are no longer probationary employees and begin accruing seniority at the end of 45 days whereas employees in the utility crew must first be assigned to a beginning job in a progression line and must successfully pass the trial period in that job. The reason for the difference is that because of the skilled nature of the jobs fed from the utility crew, and the more stringent requirements for employees going into these jobs, there was no specific trial period. We do not infer from this any discriminatory purpose.

In any event, in the 1971 contract, Joint Exhibit 12, the company and union adopted a standard 90 day trial period for all jobs. Although subsequently extended to 100 days, it has been uniform for all jobs during all periods covered by this lawsuit.

Specifically, plaintiffs claim that showing the Oiler job in the Maintenance Department and the Loader Labor job in the Shipping Department on the 1969 diagram of progression lines proves the jobs were actually in the Department and were kept separate only because of racial considerations.

The evidence, however, fully established from the very inception of the plant these jobs were always under the same supervision and that how the jobs were shown on the progression line charts did not at any time change the supervision, type of work, and had no other meaningful significance.

As the plant grew and new jobs were created and organized into these skilled and unskilled progression lines, the collective bargaining contract was extended to cover these new jobs and progression lines.

There was no evidence offered by plaintiffs suggesting these progression lines were included in the collective bargaining contract for racial purposes and in view of the convincing evidence that these progression lines were organized for sound business reasons and are necessary for the safe and efficient operation of the plant, the court finds the inclusion of these lines and separate line for seniority purposes, was for sound business reasons and that racial considerations were not involved in the decision.

As was true since inception of the plant, promotion within each progression line was based on the employee's length of service in that progression line. The record fully establishes this was equally true for black and white employees in the progression line, and that employees were promoted within the progression lines based on their progression line seniority and without regard to race.

There are and have been during all periods covered by this lawsuit substantial numbers of whites and blacks in all of the progression lines, and to the extent that having a progression seniority system discourages employees from transferring from one progression line to another, it does so for all employees.

Departmental Seniority Systems have, since passage of the Wagner Act in 1935, been widely used in industry, and promotional preference to employees within a particular department are widely prevalent in petrochemical plants throughout the United States. (PPG Exh. 22).

■ Accordingly, the court finds the seniority system in this case is bona fide within the meaning of *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

*HIRING AND JOB ASSIGNMENT*

Plaintiffs contend that blacks have been discriminated against because "defendants have instituted and/or maintained a practice or policy of failing to employ blacks because of their race or color and by failing to assign them to jobs on an equal basis as whites in violation of Title VII and/or 42 U.S.C. § 1981."

In support of this contention plaintiffs introduced Company reports filed with the Equal Employment Opportunity Commission (EEO–1 reports) showing the following number and percentage of blacks were employed by the plant as of March 31 of each year covered by this lawsuit:

| | TOTAL EMPLOYMENT | BLACK EMPLOYEES |
|------|------------------|-----------------|
| 1974 | 1154 | 239 20.71% |
| 1975 | 1212 | 252 20.79% |
| 1976 | 1310 | 269 20.53% |
| 1977 | 1529 | 305 19.95% |
| 1978 | 1794 | 358 19.96% |

However, a comparison of the percentage of blacks hired to those available for employment clearly establishes PPG has employed blacks in proportion to their availability for employment.

▮ To assist the Court in analyzing the company's employment practice, the court was presented with (1) a statistical comparison between the percentage of blacks employed in the work force and the percentage of blacks in the relevant labor market and (2) a statistical comparison between the percentage of blacks applying for jobs and the percentage of blacks hired in those jobs. These statistics fully establish there was no pattern of discrimination in the hiring or job placements of blacks.

The relevant labor market for evaluating PPG's hiring practices is Calcasieu Parish. This is the same geographical area as the Lake Charles Standard Metropolitan Statistical Area (SMSA) for which census figures are reported by the United States Bureau of the Census. (PPG Exh. 20 PPG's Request for Admissions Nos. 2–4). The 1970 census report is the most recent study of the population of Calcasieu Parish. (PPG Exh. 20—No. 6).

In 1970 17.7% of the Lake Charles SMSA labor force was black. (PPG Exh. 20, PPG Requests for Admissions Appendix A., Pg. 4 last line.) This 17.7% work force statistic is a more appropriate figure for use in analyzing PPG's hiring and employment practices than the 21.6% general population figure offered by the plaintiffs because the general population figure includes all persons including children, military personnel, and all others who are not, in fact, available for work.

The following table compares the percentage of blacks on PPG's payroll as of March 31 of each relevant year to the Lake Charles area work force figure:

| | BLACK % OF PPG EMPLOYEES* | BLACK % OF LAKE CHARLES SMSA WORK FORCE** |
|------|---------------------------|-------------------------------------------|
| 1974 | 20.71% | 17.7% |
| 1975 | 20.79% | 17.7% |
| 1976 | 20.53% | 17.7% |
| 1977 | 19.95% | 17.7% |
| 1978 | 19.96% | 17.7% |

\* Figures from Plaintiff Exhibit 3
\*\* Figures from PPG Exhibit 20 – Appx. A.

These figures show that, during each year covered by this lawsuit for which statistics are available, the percentage of blacks in PPG's work force exceeded the percentage of blacks in the general work force in the Lake Charles Area.

Even if the plaintiffs' proposed population figure of 21.6% is accepted, it is apparent there is no substantial disparity between the racial composition of PPG's work force and the general population figure. The following table demonstrates this:

| | BLACK % OF PPG EMPLOYEES | BLACK % OF LAKE CHARLES POPULATION |
|------|--------------------------|-------------------------------------|
| 1974 | 20.71% | 21.6% |
| 1975 | 20.79% | 21.6% |
| 1976 | 20.53% | 21.6% |
| 1977 | 19.95% | 21.6% |
| 1978 | 19.96% | 21.6% |

Accordingly, the court finds that there is no evidence of any discrepancy between the percentage of blacks employed by PPG and the percentage of blacks in the relevant labor market work force or the percentage of blacks in the Lake Charles area general population. To the contrary, the evidence shows that at all times during the period covered by this lawsuit PPG has had a work force which is racially comparable to the Lake Charles area work force and population. This suggests that race is not a factor in the company's employment practices.

Plaintiffs also attempted to offer evidence on the hiring issue through a compilation and analysis of PPG's personnel records. This exhibit, Pl. Exh. 21, was demonstrated to be laden with errors, based on hearsay and on factual assumptions never shown to be true.

The court cannot and does not give any weight to Plaintiffs' Exhibit 21.

Plaintiffs also offered some limited testimony in support of their contention that PPG failed to hire blacks. However, this testimony failed to identify a single black person who applied for a job at PPG and was denied employment. Other plaintiffs testified they personally knew blacks who applied for work at the plant and were employed.

Based on the foregoing, the court finds that blacks were not denied employment at PPG because of their race.

Plaintiffs further allege blacks are discriminated against by being initially assigned to less desirable departments at PPG.

Plaintiffs allege blacks were not assigned to the following allegedly desirable job categories:

a. Utility Crew

b. Craft (Service Mechanic) Jobs

c. Clerical Jobs

d. Technical Jobs

It is undisputed applicants seeking hourly positions at PPG apply for and are hired directly into three job categories: Utility Crew; Yard Utility Crew; and as Service Mechanics (Craft Jobs).

The Utility Crew is an entry pool of employees who are hired to fill vacancies in the lowest jobs in the following departments:

1. Department 5A – Power A
2. Department 5C – Power C
3. Department 10A – Chlorine Production A
4. Department 11A – Shipping
5. Department 16A – Chlorine Production C
6. Department 60A – Organics Plant B–I
7. Department 60A – Organics Plant B–II
8. Department 80A – Silica Pigments
9. Department 30A – Maintenance

Although plaintiffs contend blacks have been denied positions in the Utility Crew because of their race, the hiring statistics for October of 1969 through June of 1978, admitted by plaintiffs and introduced into evidence as PPG Exhibit 20, Appendix B–1, shows the following numbers of white, black and other employees were hired and initially assigned to the Utility Crew:

HIRING OF UTILITY CREW EMPLOYEES
AT PPG'S LAKE CHARLES PLANT,
OCTOBER 21, 1969 – JUNE, 1978

| YEAR | HIRED | | |
| | WHITE | BLACK | OTHER |
|---|---|---|---|
| 1969 Oct–Dec | 8 | 0 | 0 |
| 1970 | 4 | 1 | 0 |
| 1971 | 25 | 8 | 0 |
| 1972 | 22 | 9 | 0 |
| 1973 | 9 | 8 | 1 |
| 1974 | 21 | 13 | 0 |
| 1975 | 16 | 8 | 1 |
| 1976 | 61 | 17 | 1 |
| 1977 | 86 | 24 | 1 |
| 1978 Jan–June | 44 | 11 | 4 |

As shown by the following table, the percentage of blacks assigned to the Utility Crew during the almost 10 year period of time for which statistical information was introduced compares as follows to the 17.7% black work force in the Lake Charles SMSA.

| | BLACK % IN WORK FORCE | BLACK % ASSIGNED TO UTILITY CREW BY PPG |
|---|---|---|
| 1969 Oct–Dec | 17.7% | 0% |
| 1970 | 17.7% | 20% |
| 1971 | 17.7% | 24.24% |
| 1972 | 17.7% | 29.03% |
| 1973 | 17.7% | 44.44% |
| 1974 | 17.7% | 38.23% |

| | BLACK % IN WORK FORCE | BLACK % ASSIGNED TO UTILITY CREW BY PPG |
|---|---|---|
| 1975 | 17.7% | 32.00% |
| 1976 | 17.7% | 19.10% |
| 1977 | 17.7% | 21.62% |
| 1978 | 17.7% | 18.64% |
| Jan–June TOTAL | 17.7% | 24.65% |

In every year (except the four months of 1969) for which statistics were offered and for the total period of October 1969 through June of 1978, the percentage of black persons assigned to the Utility Crew exceeded the available percentage of blacks employed in the work force in the Lake Charles SMSA.

Even if the plaintiffs' general population figure is used for comparison purposes, the percentage of blacks assigned to the Utility Crew during this 10 year period of time is greater than the 21.6% 1970 census population figure submitted by plaintiffs.

This analysis demonstrates and the court finds, blacks were not excluded from Utility Crew jobs because of their race.

Plaintiffs do not contend they were denied entrance into the Yard Utility Crew.

Plaintiffs do allege blacks were not initially assigned to Service Mechanic jobs because of their race. The Service Mechanics are the plant's skilled craftsmen. They perform the highly skilled and complex maintenance work necessary to keep the plant running in a safe and efficient manner.

In order to be hired as a Service Mechanic an applicant must show he has four years of experience in one of the craft skills utilized by the Company. The company thoroughly investigates the background and experience of the individuals applying for these positions by contacting previous employers, and through an interview designed to elicit whether the person has the type of knowledge required of a person with that craft skill. No one is hired as a Service Mechanic unless they have this experience.

Because of the high skills required and the very hazardous nature of the jobs and the chemical processes, it is essential that the plant hire people who are qualified to perform these jobs in order to insure the maintenance work done is performed in a safe and efficient manner.

It is impossible for the plant to train all of its Service Mechanics because of the long training time and inability to project needs that far in advance, the cost of training, and the adverse consequences on existing maintenance if incumbent Service Mechanics are diverted from maintenance functions in order to train new Service Mechanics. Although PPG does train some of its own Service Mechanics, in order to adequately perform the maintenance functions, it must hire some experienced Mechanics.

The record fully establishes the very high skill levels needed to perform the job of Service Mechanic at the plant and that not everyone in the population possesses the skills and knowledge to be a craftsman.

Nine and one-half percent of the "Craft and Kindred Workers" in the Lake Charles area were black according to the 1970 census (PPG Exh. 20 App. A Pg. 3, 5th line).

Based on the EEO–1 reports the following numbers of blacks and whites were employed by PPG as skilled Service Mechanics as of March 31st of each year relevant to this action:

| | WHITE | BLACK | OTHER |
|---|---|---|---|
| 1974 | 405 | 28 | 1 |
| 1975 | 447 | 34 | 1 |
| 1976 | 471 | 40 | 3 |
| 1977 | 515 | 53 | 4 |
| 1978 | 602 | 81 | 7 |

Based on these figures, the following table compares the percentage of black craftsmen in PPG's workforce to the percentage available in the Lake Charles area:

| | PPG'S WORK FORCE | LAKE CHARLES AREA |
|---|---|---|
| 1974 | 6.45% | 9.5% |
| 1975 | 7.05% | 9.5% |
| 1976 | 7.78% | 9.5% |
| 1977 | 9.26% | 9.5% |
| 1978 | 11.73% | 9.5% |

This is the appropriate comparison for examining whether PPG excludes blacks from craftsman positions. These figures do not show any or gross disparity between the percentage of black craftsmen in PPG's work force and the percentage of black

craftsmen available in the relevant labor market.

Most of PPG's craft employees have been hired directly as craftsmen. Each year a number of employees start to train to be craftsmen by entering the apprenticeship program.

There is no statistical evidence showing blacks are excluded from the job of service mechanic.

Plaintiffs also alleged that PPG unlawfully excluded blacks from technical positions.

Although plaintiffs assert that blacks were denied technical positions in the pre-trial order, they offered no testimony on the issue; failed to identify a single black who desired a technical position; failed to identify what position they considered to be technical; and failed to offer any statistical analysis on the issue.

The only credible evidence relating to this issue offered by the plaintiffs were the plant's EEO-1 reports. The EEO-1 (Pl. Exh. 3) reports show the following racial breakdown of employees employed as Technicians by PPG as of March 31 of each year covered by this lawsuit:

| | TOTAL | BLACK |
|---|---|---|
| 1974 | 35 | 9 |
| 1975 | 28 | 6 |
| 1976 | 32 | 6 |
| 1977 | 38 | 9 |
| 1978 | 46 | 11 |

The following table compares the percentage of black "Technicians" to the 17.7% black workforce figure and the 21.6% black general population figure:

| | % BLACK TECHNICIANS AT PPG | % BLACK WORKFORCE | % BLACK POPULATION |
|---|---|---|---|
| 1974 | 25.71% | 17.7% | 21.6% |
| 1975 | 21.43% | 17.7% | 21.6% |
| 1976 | 18.75% | 17.7% | 21.6% |
| 1977 | 23.68% | 17.7% | 21.6% |
| 1978 | 23.91% | 17.7% | 21.6% |

These figures fully establish that at all times relevant to this action the percentage of black "Technicians" employed at PPG exceeded the percentage of blacks in the Lake Charles area work force, and was of-ten higher than the percentage of blacks in the general population of the Lake Charles area.

Accordingly, the court finds there is no statistical evidence to support the conclusion that blacks were excluded from "Technician" jobs at PPG.

Plaintiffs also alleged that blacks were excluded from Clerical positions at PPG.

Although plaintiffs asserted that blacks were excluded from clerical positions in the Pre-Trial Order they offered no testimony on the issue; failed to identify a single black who desired a clerical position; and failed to offer any statistical analysis on the issue.

Plaintiffs also failed to identify the clerical positions at the plant and to describe the type of work and the skills necessary to perform the work.

It is clear, and we find that not everyone in the general population is capable of performing nor has the desire to perform clerical work.

Plaintiffs offered over 40 witnesses but none of them testified they desired to perform clerical work. Six and six-tenths percent of the Lake Charles area Clerical and Kindred Workers were black according to the 1970 census. (PPG Exh. 20 Item 15). The only evidence on this issue offered by plaintiffs consisted of information contained in the EEO-1 reports.

The EEO-1 reports show the following number of Total and Black "Office and Clericals" were employed by PPG as of March 31 of each year covered by this lawsuit:

| | TOTAL | BLACK |
|---|---|---|
| 1974 | 80 | 8 |
| 1975 | 85 | 9 |
| 1976 | 96 | 13 |
| 1977 | 107 | 16 |
| 1978 | 135 | 23 |

The following table show the percentage of blacks "Office and Clerical" employers in PPG's workforce as of March 31 of each year as compared to the percentage of black clerical employers in the Lake Charles area:

| | % BLACK PPG | % BLACK – LAKE CHARLES AREA |
|---|---|---|
| 1974 | 10% | 6.6% |
| 1975 | 10.59% | 6.6% |
| 1976 | 13.51% | 6.6% |
| 1977 | 14.95% | 6.6% |
| 1978 | 17.04% | 6.6% |

Accordingly, these figures clearly establish at all times covered by this lawsuit PPG employed a higher percentage of black clerical employees than the percentage of black clericals employed in the Lake Charles area.

In addition to the static comparisons made above, the court was presented with a flow analysis which examined the racial impact of the actual hiring selections made by PPG for each of the categories from which plaintiffs alleged blacks were excluded.

PPG presented evidence, admitted as true by plaintiffs, showing the number and racial makeup of the applicants and persons hired for craft (Service Mechanic), Utility Crew, Office and Clerical, Technical Employees and Service Workers as follows:

### CRAFTSMEN (SERVICE MECHANICS)

| YEAR | APPLICANTS | | | HIRED | | |
|---|---|---|---|---|---|---|
| | WHITE | BLACK | OTHER | WHITE | BLACK | OTHER |
| 1969/ Oct–Dec | 21 | 0 | 0 | 1 | 0 | 0 |
| 1970 | 99 | 3 | 0 | 13 | 0 | 0 |
| 1971 | 176 | 2 | 0 | 14 | 0 | 0 |
| 1972 | 294 | 10 | 0 | 17 | 0 | 0 |
| 1973 | 126 | 7 | 0 | 25 | 2 | 0 |
| 1974 | 214 | 13 | 0 | 36 | 3 | 0 |
| 1975 | 247 | 6 | 0 | 30 | 3 | 2 |
| 1976 | 280 | 19 | 0 | 46 | 2 | 0 |
| 1977 | 309 | 25 | 0 | 68 | 3 | 1 |
| 1978/ Jan–June | 168 | 22 | 0 | 37 | 2 | 2 |

(PPG–Exh. 20 Attachments B–5 and D–5)

### UTILITY CREW

| YEAR | APPLICANTS | | | HIRED | | |
|---|---|---|---|---|---|---|
| | WHITE | BLACK | OTHER | WHITE | BLACK | OTHER |
| 1969/ Oct–Dec | 108 | 20 | 0 | 8 | 0 | 0 |
| 1970 | 759 | 180 | 0 | 4 | 1 | 0 |
| 1971 | 826 | 212 | 0 | 25 | 8 | 0 |
| 1972 | 794 | 336 | 0 | 22 | 9 | 0 |
| 1973 | 818 | 362 | 0 | 9 | 8 | 1 |
| 1974 | 1261 | 567 | 0 | 21 | 13 | 0 |
| 1975 | 1287 | 572 | 0 | 16 | 8 | 1 |
| 1976 | 2375 | 1134 | 0 | 61 | 17 | 1 |
| 1977 | 2499 | 1050 | 0 | 86 | 24 | 1 |
| 1978/ Jan–June | 909 | 390 | 0 | 44 | 11 | 4 |

(PPG–Exh. 20 Attachments B–1 and D–1)

## OFFICE CLERICAL

| YEAR | APPLICANTS | | | HIRED | | |
|------|-------|-------|-------|-------|-------|-------|
| | WHITE | BLACK | OTHER | WHITE | BLACK | OTHER |
| 1969/ Oct–Dec | 26 | 1 | 0 | 3 | 0 | 0 |
| 1970 | 210 | 34 | 0 | 6 | 0 | 0 |
| 1971 | 182 | 46 | 0 | 9 | 3 | 0 |
| 1972 | 161 | 44 | 0 | 8 | 3 | 0 |
| 1973 | 149 | 74 | 0 | 6 | 1 | 1 |
| 1974 | 269 | 141 | 0 | 10 | 3 | 0 |
| 1975 | 260 | 89 | 0 | 7 | 3 | 0 |
| 1976 | 419 | 176 | 0 | 20 | 7 | 0 |
| 1977 | 745 | 373 | 0 | 19 | 7 | 0 |
| 1978/ Jan–June | 258 | 195 | 0 | 4 | 1 | 0 |

(PPG–Exh. 20 Attachments B–3 and D–3)

## TECHNICAL JOBS

| YEAR | APPLICANTS | | | HIRED | | |
|------|-------|-------|-------|-------|-------|-------|
| | WHITE | BLACK | OTHER | WHITE | BLACK | OTHER |
| 1969/ Oct–Dec | 36 | 1 | 0 | 1 | 0 | 0 |
| 1970 | 128 | 2 | 0 | 2 | 0 | 0 |
| 1971 | 72 | 14 | 0 | 5 | 0 | 0 |
| 1972 | 68 | 13 | 0 | 3 | 2 | 0 |
| 1973 | 65 | 18 | 0 | 5 | 0 | 0 |
| 1974 | 42 | 10 | 0 | 1 | 0 | 0 |
| 1975 | 43 | 17 | 0 | 4 | 1 | 0 |
| 1976 | 93 | 14 | 0 | 1 | 1 | 0 |
| 1977 | 152 | 42 | 0 | 17 | 2 | 0 |
| 1978/ Jan–June | 125 | 34 | 0 | 3 | 0 | 0 |

(PPG–Exh. 20 Attachments B–6 and D–4)

## SERVICE WORKER

| YEAR | APPLICANTS | | | HIRED | | |
|------|-------|-------|-------|-------|-------|-------|
| | WHITE | BLACK | OTHER | WHITE | BLACK | OTHER |
| 1969/ Oct–Dec | 0 | 0 | 0 | 0 | 0 | 0 |
| 1970 | 12 | 2 | 0 | 0 | 0 | 0 |
| 1971 | 16 | 4 | 0 | 0 | 0 | 0 |
| 1972 | 33 | 2 | 0 | 4 | 1 | 0 |
| 1973 | 25 | 5 | 0 | 2 | 0 | 0 |
| 1974 | 32 | 6 | 0 | 3 | 0 | 0 |
| 1975 | 25 | 8 | 0 | 3 | 0 | 0 |
| 1976 | 72 | 24 | 0 | 7 | 1 | 1 |
| 1977 | 50 | 13 | 0 | 4 | 2 | 0 |
| 1978/ Jan–June | 47 | 14 | 0 | 5 | 2 | 0 |

(PPG–Exh. 20, Request for Admissions, Attachments B–7 and D–6)

The foregoing statistical information shows the flow of persons by race into the job categories from which plaintiffs allege blacks are excluded.

This information was subjected to analysis and interpretation by Mr. William Ruch. Mr. Ruch, recognized as an expert statistician by the court, testified concerning a "standard deviation" statistical analysis he performed on the employment statistics of the company. Mr. Ruch testified about whether the number of blacks hired for each of these jobs was within two to three standard deviations of the number of blacks expected to be hired based on chance for those jobs under the formula approved by the Supreme Court in *Castaneda v. Partidas*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) and *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

For each category from which plaintiffs alleged blacks were excluded, Mr. Ruch prepared an exhibit showing the standard deviation analysis. (PPG–Exh. 195–200). Mr. Ruch explained in detail how he performed this analysis using the craft job category (PPG–Exh. 195) as an example. PPG–Exh. 195 is as follows:

STANDARD DEVIATION ANALYSIS

Craft

| Year | % Black in RLM * | Total Actual Hires | Total Black Hires | Hypothetical Black Hires | Deviation | Standard Deviation | Conclusion |
|------|------------------|--------------------|-------------------|--------------------------|-----------|--------------------|------------|
| 1969 | 0 | 1 | 0 | 0.00 | 0.00 | | Actual value is within 2 standard deviations of hypothetical. |
| 1970 | 2.94 | 13 | 0 | 0.38 | −0.38 | 0.61 | Actual value is within 2 standard deviations of hypothetical. |
| 1972 | 3.29 | 17 | 0 | 0.56 | −0.56 | 0.74 | Actual value is within 2 standard deviations of hypothetical. |
| 1973 | 5.26 | 27 | 2 | 1.42 | 0.58 | — | — |
| 1974 | 5.73 | 39 | 3 | 2.23 | 0.77 | 0 | — |
| 1975 | 2.37 | 35 | 3 | 0.83 | 2.17 | — | — |
| 1976 | 6.35 | 48 | 2 | 3.05 | −1.05 | 1.69 | Actual value is within 2 standard deviations of hypothetical. |
| 1977 | 7.49 | 72 | 3 | 5.39 | −2.39 | 2.23 | Actual value is within 2 standard deviations of hypothetical. |
| 1978 | 11.58 | 41 | 2 | 4.75 | −2.75 | 2.05 | Actual value is within 2 standard deviations of hypothetical. |
| 1969–1978 | 5.24 | 307 | 15 | 16.09 | −1.09 | 3.90 | Actual value is within 2 standard deviations of hypothetical. |

* RLM based upon applicants.

To perform this analysis Mr. Ruch first determined the percentage of blacks in the Relevant Labor Market (RLM) (Column 2) by calculating the percentage of blacks who applied for Craft jobs using the information, admitted by plaintiffs and introduced as PPG-Exh. 20, Attachment D–5.

Mr. Ruch then determined the total actual number of persons and actual number of blacks hired into Craft jobs (Column 3 and 4) during each year. This was also determined from information admitted by plaintiffs and introduced as PPG-Exh. 20—Attachment B–5.

The remainder of PPG-Exh. 195 (Columns 408) were calculated by Mr. Ruch using the standard deviation analysis.

Mr. Ruch first calculated the number of "Hypothetical Black Hires" (Column 5) by multiplying the percentage of blacks in the

relevant labor market (Column 2) times the total number of persons hired (Column 3). This figure gives the hypothetical number of blacks which should be hired if hiring decisions were based strictly on chance.

The next figure calculated by Mr. Ruch was the "Deviation" (Column 6). This is the difference between the number of blacks actually hired (Column 4) and the hypothetical number based on chance (Column 5).

Mr. Ruch next calculated the standard deviation using the formula described by the Supreme Court in *Hazelwood* and *Castaneda*. This formula was introduced into evidence as PPG-Exh. 204. Mr. Ruch found that in no instance did the results of this analysis show that the number of blacks hired for craft jobs was more than 2 to 3 standard deviations below the number expected by chance.

After calculating the standard deviation (Column 7) Mr. Ruch compared this deviation to the standard deviation to reach his conclusion using the standard of 2 to 3 standard deviations set by the Supreme Court. Mr. Ruch reached a conclusion as to whether the observed deviation (Column 6) was within two standard deviations (Column 7).

Mr. Ruch also explained why for certain years he did not calculate a standard deviation nor make a conclusion. In connection with PPG-Exh. 195 this occurred in 1969, 1973, 1974 and 1975. In these years the number of blacks selected was actually equal to or exceeded the number which one would expect based on chances. Since the issue being analyzed was whether blacks were disproportionately excluded from craft positions, there was no need to analyze these years.

Mr. Ruch repeated the above described analysis for each of the categories from which plaintiffs alleged blacks were excluded:

Utility Crew (PPG-Exh. 197)

Office and Clerical (PPG-Exh. 198)

Technical Employees (PPG-Exh. 199)

Service Workers (PPG-Exh. 200) *

---

* Although plaintiffs did not allege in the pretrial order that blacks were excluded from this position, they did offer testimony on this issue.

Mr. Ruch also testified that he performed a more sophisticated statistical analysis on the date calculating the Fischer exact probability statistic.

Based on all his analysis, Mr. Ruch concluded that there was no statistical evidence to support the conclusion that blacks were excluded from Craft (Service Mechanic), Utility Crew, Office and Clerical, Technical, or Service Worker jobs because of their race and further, that the statistical analysis supported the conclusion that race was not a factor in the selection of employees for each of these job categories.

The plaintiffs' expert, Dr. James Outtz, reviewed the Standard Deviation analysis prepared by Mr. Ruch. He also reviewed some of the calculations for accuracy and found them to be correct.

Dr. Outtz further testified that if the information on PPG-Exh. 195–200 in the column marked "relevant labor market" were accurate and appropriate, he would come to the same conclusions as Mr. Ruch did in connection with these exhibits.

The court finds that Mr. Ruch accurately gathered the information for use in his analysis and appropriately calculated the standard deviations for each of the job categories examined in the tables marked PPG-Exhs. 195, 197, 198, 199, and 200.

The information in the "Relevant Labor Market" column on PPG-Exhs. 195–200 came from information which was admitted to be true by the plaintiffs.

The court credits the testimony of Mr. Ruch concerning the statistical analysis and the conclusion to be drawn from the results. Further, the court's own nontechnical review of the statistics shows that there is no pattern of exclusion from any of the categories from which plaintiffs complain blacks were excluded.

For each job category, although blacks were selected in some years in numbers and

percentages slightly lower than their availability in the applicant pool, in other years blacks were selected in numbers and percentages higher than their availability.

Blacks were selected for Service Mechanic jobs in a proportion equal to or higher than their availability in the relevant applicant pool in 1969, 1973, 1974 and 1975.

Blacks were selected for Utility Crew positions in a proportion equal to or higher than their availability in the relevant applicant pool in 1970, 1971, 1973, 1974 and 1975.

Blacks were selected for Office and Clerical positions in a proportion equal to or higher than their availability in the relevant applicant pool in 1971, 1972, 1975.

Blacks were selected for Technical positions in a proportion equal to or higher than their availability in the relevant applicant pool in 1972 and 1976.

Blacks were selected for Service Worker positions in a proportion equal to or higher than their availability in the relevant applicant pool in 1969, 1970, 1971, 1972, 1977 and 1978.

The court finds that there is no statistical evidence to support plaintiffs' allegation that blacks were excluded from craft or Service Mechanic jobs. Rather, the analysis of the flow statistics offered by PPG shows that race was not a factor in the selection of employees for these jobs.

The court finds that there is no statistical evidence to support plaintiffs' allegation that blacks were excluded from the Utility Crew. Rather, the analysis of the flow statistics offered by PPG shows that race was not a factor in the selection of employees for these jobs.

The court finds that there is no statistical evidence to support plaintiffs' allegation that blacks were excluded from Office and Clerical jobs. Rather, the analysis of the flow statistics offered by PPG shows that race was not a factor in the selection of employees for these jobs.

The court finds that there is no statistical evidence to support plaintiffs' allegation that blacks were excluded from Technical jobs. Rather, the analysis of the flow statistics offered by PPG shows that race was not a factor in the selection of employees for these jobs.

The court finds that there is no statistical evidence to support plaintiffs' allegation that blacks were excluded from Service Workers jobs. Rather, the analysis of the flow statistics offered by PPG shows that race was not a factor in the selection of employees for these jobs.

There is no evidence to support a finding that blacks are discriminated against in terms of job assignment. Blacks entering the work force are assigned to each of the different categories in numbers and percentages which are not substantially less than and in some cases actually exceed the percentage of blacks who apply for these jobs.

As demonstrated by the foregoing, the court finds that both the static examination of PPG's employment figures and the flow analysis of the selection figures during the time period relevant to this suit prove that PPG has employed and assigned blacks to all job categories without regard to their race.

Plaintiffs failed to offer any meaningful evidence tending to prove the company discriminated against blacks in hiring or job assignment.

With respect to some of the job categories from which plaintiffs alleged blacks were excluded, plaintiffs did little if anything more than offer statistics obtained from the Company's EEO–1 reports.

With respect to clerical and technical jobs, plaintiffs failed to identify a single individual who desired and/or claimed to be excluded from these jobs.

With respect to other job categories such as the Craft jobs or the Utility Crew, plaintiffs presented only the personal opinion of the individual named plaintiffs to the effect that they desired these jobs and "felt" that they could perform them.

The statistics show that many blacks and whites were hired or assigned to the jobs in question. Plaintiffs' subjective feelings

that they wanted these jobs and could perform them does nothing to overcome the overwhelming statistical evidence showing blacks were assigned to these jobs.

## TESTING

### HISTORY AND BACKGROUND

Because of the highly skilled and hazardous nature of the jobs, the considerable risk to the safety of other employees and in some cases the public generally, as well as the risk of substantive damage to the equipment and chemical processes, Mr. Clem White at the time the plant first started operations recommended and subsequently implemented requirements that all employees entering the Production Department, Power Department, Shipping Department and Maintenance Department undergo extensive screening procedures to determine if they had the qualifications to learn to perform the skilled jobs.

He testified without contradiction and the court finds it was not feasible to hire employees for these skilled jobs randomly off the street. In addition to the considerable cost involved with each turnover, the discharge of unsuitable employees, wasted training efforts, and administrative hiring burdens caused by the increased need for new employees; and because of the extended training time, there was a substantial risk employees might perform satisfactorily up to a certain level in the progression line but be incapable of performing any higher level jobs. If the employee were performing satisfactorily at his present level and could not be discharged, this would result in clogging the progression of jobs and removing essential steps in the training process designed by Mr. White. Further, it could leave the company without adequate trained personnel to operate the plant.

To prevent the serious adverse consequences of random selection, the screening procedures included a thorough review of the applicant's prior work history, an investigation of the applicant's experience with prior employers, structured interviews designed to elicit information about the employee's ability to perform the jobs, and paper and pencil tests designed to determine whether the applicant had substantial mental abilities sufficient to perform the higher level and more complex jobs in the plant. The company retained Dr. Baker, Head of Industrial Psychology at the University of Texas, to advise them about what tests should be adopted.

After an investigation of the jobs at the plant, Dr. Baker recommended the use of a mechanical aptitude test and the Otis Test which was widely used by industry and also the U. S. Armed Forces.

Shortly after, based on the recommendations of Dr. Tydlaska, an Industrial Psychologist from the University of Texas, the company began using the Bennett Mechanical Aptitude Test to screen applicants for the skilled jobs.

Since that time, all applicants, other than skilled craftsmen with four or more years of demonstrated journeymen craft skills, for jobs in the skilled progression lines have been required to pass the Bennett Mechanical Aptitude Test.

In the beginning the passing score on the test was 38. This was lowered to 35 in 1969 and later lowered to 25.

In the early 1960's PPG hired Dr. Robert Ramsay to be its Manager of Psychological and Selection Services.

The company continued to use the Otis Test until 1969 when, based on the recommendations of the company's industrial psychologist, Dr. Ramsay, it changed to the Wonderlic Test.

There is extensive uncontradicted testimony in the record by highly qualified industrial psychologists that the Otis Test and Wonderlic Test are both general aptitude tests that are virtually identical, and that the passing score adopted for the Wonderlic Test was equivalently lower than the passing score previously used for the Otis Test.

As described in more detail below, in 1968, Dr. Ramsay commenced his investigation to determine by scientifically acceptable procedures whether the tests used at PPG's Lake Charles plant validly predicted job performance. Before commencing this

study, Dr. Ramsay decided not to attempt to validate the Otis Test at Lake Charles because the test was becoming out of date and was not being properly maintained by its authors.

Dr. Ramsay decided to recommend to the plant that they abandon the use of the Otis Test and substitute in its place the Wonderlic Personnel Test (Wonderlic). The plant accepted this recommendation and in late 1969, as Dr. Ramsay's validation study was in progress, changed over from the Otis Test to the Wonderlic Test.

Based on his validation study, Dr. Ramsay originally recommended that the plant require persons to obtain a score of 17 or higher on the Wonderlic Test and 35 or higher on the Bennett Test in order to qualify for the Utility Crew.

Although these qualifying scores were used for a short time in the early 1970's, Dr. Ramsay recommended lowering these minimum score requirements to a 15 on the Wonderlic and a 25 on the Bennett.

Presently, and at all times covered by this lawsuit, PPG requires all persons to achieve a score of 15 on the Wonderlic Test and 25 on the Bennett Test before being eligible for the Utility Crew.

The jobs fed by the Utility Crew entry pool include the jobs in the following departments:

| Power Department | 5A |
| Power Department | 5C |
| Chlorine Production | 10A |
| Chlorine Production | 16A |
| Shipping | 11A (Lead Loader Line of Progression) |
| Organics B–I | 60A |
| Organics B–II | 60A |
| Silica Pigments | 80A |
| Maintenance | 30A |

## PLAINTIFFS' ALLEGATIONS

Plaintiffs make two, somewhat independent, attacks on PPG's use of these tests.

Plaintiffs allege PPG is using these tests as a selection device and that while the tests are neutral on their face, they are having a disparate impact against blacks. Secondly, plaintiffs allege that because PPG did not require incumbent employees in the jobs fed by the Utility Crew to exceed the score of 15 on the Wonderlic in 1969 when the company changed from the Otis Test to the Wonderlic Test that, therefore, it is unlawful for PPG to require employees who were employed in the Yard Crew jobs at the time to achieve a 15 on the Wonderlic before being eligible for the Utility Crew.

## DISPARATE IMPACT

Plaintiffs introduced testimony by Dr. Outtz in connection with plaintiffs' Exhibit No. 5 seeking to show that these tests, as used by PPG, had an adverse impact on blacks. However, Dr. Outtz' testimony did not purport to analyze selection of employees, or selection rates of blacks versus whites.

Under the Uniform Guidelines on Employee Selection, adverse impact is defined in terms of the actual selection of employees, not relative test performance.

In their post-trial brief, plaintiffs refer to the so called 4/5ths rule included in the Uniform Guidelines.

The court has already determined that blacks were selected for Utility Crew positions in numbers and percentages substantially in excess of not only the percentage of blacks in the labor force of Lake Charles but also in excess of the black population of Lake Charles. Further, comparison of the number of blacks selected for Utility Crew jobs to the number of black applicants at the plant did not establish any disparate impact against blacks.

Additionally, the court was also presented with a substantial amount of testimony concerning the 4/5ths rule. However, the court was not presented with any analysis of the hiring or initial assignment data using the 4/5ths rule.

Mr. Ruch, on cross examination, described in some detail the formula (introduced as PPG-Exh. 206) for the 4/5ths rule and how it worked.

Mr. Ruch criticized the 4/5ths rule because it failed to take chance occurrences into account, rendered absurd results in certain instances, and generally was not a statisti-

cally sound procedure for use in analyzing data of the nature presented to the court.

Even the agencies who published the Uniform Guidelines recognize the ⅘ths rule as a "rule of thumb."

Dr. Outtz testified that the ⅘ths rule was an administrative "rule of thumb" used by agencies to set priorities. He further testified that it was not a "hard and fast" rule and further that it was not necessarily appropriate to use it in all circumstances.

The court was also presented with the testimony of Dr. William Mobley on the ⅘ths rule. He testified that the ⅘ths rule was not an appropriate statistical procedure for analyzing whether a set of statistics indicate that blacks have been disproportionately excluded from a given job or group of jobs.

Dr. Mobley testified that he served on a Committee of Division 14 of the American Psychological Association whose purpose was to review and comment on the Uniform Guidelines on Employee Selection Procedures as they were developed.

Division 14 of the American Psychological Association is the professional psychologists association whose members are engaged in industrial psychology. Members of this group specialize in, inter alia, employee selection procedures and their impact.

As a member of this committee Dr. Mobley recommended to the Executive Board of Division 14 that the organization should criticize and refuse to support the Uniform Guideline's adoption of the ⅘ths rule. This recommendation was accepted and Division 14, acting through its Executive Board, refused to support the ⅘ths rule because, in their opinion, the rule was not statistically meaningful, had no statistical nor substantive basis and was inadequate for operational use. Dr. Mobley concurred in this opinion.

■ The court finds that the ⅘ths rule is not an appropriate statistical test to use in examining the question of whether blacks have been discriminated against by being denied entrance into specific job categories.

■ Accordingly, the court finds PPG's use of the Wonderlic and Bennett Test to screen employees for the Utility Crew has not caused an adverse impact against blacks. The use of these tests has not, as a matter of fact, resulted in discrimination against blacks.

## VALIDATION OF TESTS

■ Even assuming the tests have a disparate impact against blacks, as discussed below the evidence fully establishes the tests are valid predictors of a person's ability to be trained for and perform the jobs for which the tests are used. Further, the tests, as used, serve a practical and substantial business purpose.

The court was presented with evidence from an array of expert witnesses on a large number and variety of technical issues which of necessity are involved in determining whether or not the tests used by PPG are in fact related to or predictive of job performance for the various jobs at PPG.

The court was tendered and accepted as experts in the field of psychological testing for employment purposes the following witnesses:

Dr. R. S. Ramsay. Dr. Ramsay has a Ph.D. in psychology from Michigan State University, taught Industrial Psychology for several years at Carnegie-Mellon University in Pittsburgh, and was hired by PPG in 1963 to be its Manager of Psychological and Selection Services. Dr. Ramsay is a member of Division 14 of the American Psychological Association (APA).

Dr. Charles Lawshe. Dr. Lawshe, a past president of Division 14 of the APA, wrote the first textbook dealing strictly with personnel testing ever published. He has been involved in the development, validation and study of tests and other selection devices for almost 40 years. He was a professor at Purdue University and then Head of the Department of Industrial Psychology. He then became Dean of Purdue's extension campus program. Since his retirement from Purdue in the early 1970's Dr. Lawshe has been actively

consulting in the field of industrial psychology.

Dr. William Mobley. Dr. Mobley, also a Ph.D. psychologist, was at the time of trial the Head of the Department of Management at Texas A & M University. Dr. Mobley had previously worked for PPG as a psychologist. When he graduated from the University of Maryland he was awarded the outstanding dissertation award by Division 14 of the APA for his doctoral work. He has also been the recipient of a Fulbright Scholarship.

Mr. William Ruch. Mr. Ruch, an executive with Psychological Services, Inc., has practiced in the field of industrial psychology for over 20 years. He has been involved in the development, validation and use of tests and other selection procedures during this time. He has published a number of articles on the subjects of validation and employee selection. Mr. Ruch has also taught statistics and has published a handbook on statistics.

Dr. Frank Schmidt. Dr. Schmidt is a research psychologist for the United States Government's Office of Personnel Management. In this capacity he conducts research for the government on, inter alia, selection of employees and the use of tests. Dr. Schmidt is also a professor of psychology at George Washington University.

Dr. Mary Lewis. Dr. Lewis obtained her Ph.D. from the University of Georgia where she studied specifically the use of bio-data systems in employee selection. Dr. Lewis is an employee of PPG.

Dr. James Outtz. Dr. Outtz obtained his Ph.D. degree in Industrial Psychology in 1977. Since that time he has been engaged in consulting work, mainly for state and local governments. He has also testified in a number of Title VII cases involving the legality of the use of tests.

The court was also presented with the testimony of Dr. James Sharf, through deposition. (PPG–Exhs. 192–193). The parties stipulated that Dr. Sharf was an expert in the use of tests for employment purposes. PPG–Exh. 192, page 4, line 1–4. Dr. Sharf served for 4 years as a staff psychologist for the Equal Employment Opportunity Commission.

Dr. Ramsay began his validation work in Lake Charles in 1968. Validation is the process that professional industrial psychologists use to attempt to study whether objective selection devices, such as an individual's scores on paper and pencil tests, are related to the individual's performance of a given job or group of jobs. It is through the process of validation that psychologists demonstrate the tests are job related.

Dr. Ramsay decided, based on his familiarity with the selection problems of industry and his familiarity with the Lake Charles plant, to attempt to evaluate the validity, or show the job relatedness of, the Wonderlic Personnel Test (Wonderlic) and the Bennett Test of Mechanical Comprehension (Bennett).

The Wonderlic Test is a professionally developed test of general mental ability. The test is one of the most widely used and most often studied tests of this type. The test measures a person's verbal, mathematical, and spatial reasoning abilities. The test has also been demonstrated to measure a person's learning ability.

Dr. Outtz, the plaintiffs' expert psychologist, agreed that the Wonderlic was a professionally developed test.

The Bennett Test is a test of a person's mechanical comprehension. The test is one of the most widely used tests of mechanical comprehension in this country. The Bennett also is a professionally developed test.

Dr. Outtz agreed that the Bennett was a professionally developed and widely used test.

Mr. Ruch testified concerning the process test developers use to insure that tests are properly and professionally developed. Mr. Ruch testified that he was familiar with how the Wonderlic and Bennett tests were developed and that, in his opinion, they are both professionally developed tests.

The process of developing a test is a sophisticated science. It results in tests which are expected to measure pre-selected

mental abilities. It is inappropriate for the layman to base conclusions on the appropriateness of tests like the Wonderlic and Bennett based on their own perception of the items on the test. The process of developing a test results in a series of test items which widespread experimental testing has demonstrated to be appropriate.

Dr. Ramsay decided to study the job relatedness of the Wonderlic and Bennett tests in the Lake Charles plant by using a "criterion related" strategy for validating the tests.

To perform a criterion related validity study, the psychologist is first required to gather two major sets of information.

The first piece of information is the test score. The test score information is gathered on each of the individuals in the study. Dr. Ramsay performed this task in Lake Charles. Because the Bennett Test has been administered over the years at the plant, the Bennett scores were obtained from records at the plant. In order to obtain Wonderlic scores Dr. Ramsay supervised the administration of the Wonderlic Test to the employees of the plant.

The second item of information needed for the criterion related validity study is a measure of the employee's job performance. This measure, known as the "criterion," is most frequently obtained through the use of supervisor ratings of employee job performance. The criterion must be relevant to important aspects of job performance as demonstrated by a review of information about the job.

Dr. Ramsay developed a form for use in his original study while in Lake Charles. This form, known as form "7900," was developed by Dr. Ramsay with the aid of two assistants, both of whom were familiar with jobs in chemical plants such as PPG's Lake Charles plant. Dr. Ramsay's purpose in developing form 7900 was to create a form which allowed supervisors to make judgments about employees on a number of different dimensions of job related performance.

Form 7900 was included as part of PPG–Exh. 186 (Tab 14, page 2). The form gives instructions to the persons filling out the form and asks them to rate the employee on a scale of 1 to 12 on 10 different criteria. The dimensions of job performance, as described by Dr. Ramsay on the form, involve such attributes as understanding instructions, handling on the job problems and job learning ability, among others. Dr. Ramsay attempted to have supervisors measure criteria which were relevant and applicable to the jobs fed by the Utility Crew at PPG's Lake Charles plant.

The court finds based on its own review of the form, Dr. Ramsay's testimony, and the court's familiarity with the jobs in question developed through the testimony of other witnesses, that form 7900 does ask supervisors to rate employees on criteria relevant to performance in the jobs fed by the Utility Crew at PPG's Lake Charles plant.

Dr. Ramsay personally supervised the gathering of the employee performance ratings. He gave instructions to each rater and satisfied himself that the rater understood and could properly fill out the rating form. Dr. Ramsay also insured the raters knew he was available to answer questions.

Dr. Lawshe, Mr. Ruch, and Dr. Mobley all testified they had reviewed how Dr. Ramsay developed the form 7900 rating criterion, how he instructed the raters and how he gathered the ratings. In the opinion of each of these experts the rating form was developed in an appropriate and professional manner and was properly used to develop criteria information in connection with this validation study.

Dr. Outtz criticized the use of the 7900 rating form alleging it was too subjective and allowed for error. However, Dr. Outtz admitted that most of the errors in ratings which occur using a form such as the 7900 lead to results which show a lower degree of relationship than actually exists between the test scores and job performance. Thus, these errors tend to result in an underestimation of validity as opposed to a finding of validity when in fact none exists.

Dr. Outtz could not credibly or specifically identify any errors caused by the use of form 7900 which artificially inflated the findings of Dr. Ramsay's study. The errors Dr. Outtz speculated about which might have caused such a result were specifically discounted by Mr. Ruch as being unlikely to have occurred. The court credits the testimony of Mr. Ruch on this point.

Further, Mr. Ruch explained that subjective evaluations have always been widely used and accepted by psychologists in conducting validation studies. He further explained that subjective evaluations may in fact be superior to alleged objective measures of job performance.

Dr. James Sharf reviewed form 7900 and found it in his opinion to be a professionally acceptable criterion for use in this study. (PPG–Exh. 193, page 57).

Further, while he was a staff psychologist for the EEOC, Dr. Sharf reviewed Dr. Ramsay's 1969–1971 validation study (PPG–Exh. 192) and approved of the criterion form 7900.

Although the criterion information developed by the use of form 7900 is "subjective" in that it is based on an evaluation by an employee's supervisor, it is nevertheless appropriate for use in a validation study of this nature because the supervisors are directed to evaluate specific dimensions of job relevant behavior and they were given ample instructions on how to use the form.

The court finds that criterion form 7900 is a proper and professionally appropriate criterion for use in the validity study conducted by Dr. Ramsay and introduced as PPG–Exh. 186. The criteria was a measure of relevant job performance dimensions for the jobs in the lines of progression fed from the Utility Crew at PPG's Lake Charles plant. The court further finds that Dr. Ramsay gathered the supervisor ratings in a proper and professional manner.

Subsequent to gathering these two sets of information, the next step in the validation process is to have this information statistically analyzed using standard correlation statistics to determine whether there is a meaningful relationship between the test scores and the performance ratings.

Psychologists have standard techniques for conducting this analysis and for evaluating the meaning of the results. These statistical techniques, known as correlational analysis, statistically measure the relationship between two variables such as test scores and performance ratings.

The most common and well accepted correlational analysis, and the one used by Dr. Ramsay, is known as the Pearson Product-Moment Correlation. This analysis results in a number ranging between 0 and 1, which is an index of the relationship between the two variables, such as tests and job performance. Psychologists agree that if they find evidence of a correlation at a "statistically significant level," then there is evidence showing the tests are related to job performance. The term "statistically significant level" is a technical term which describes the degree of confidence the psychologist can put in his results.

Psychologists generally agree that if they find a correlation between two variables which is statistically significant at the ".05 level of significance" (i. e., there is a 95% chance that the relationship actually exists) then they will generally conclude that the two variables are in fact related. This ".05 level of significance" is also adopted by the Uniform Guidelines on Employee Selection Procedures. Section 14(B)(5).

Dr. Ramsay conducted this analysis for each of the departments fed by the Utility Crew at PPG's Lake Charles plant. These analyses are included, along with job analysis descriptive information, and tables showing performance and test scores of employees, in PPG–Exh. 186.

Dr. Outtz did not challenge the accuracy or appropriateness of any of Dr. Ramsay's calculations.

Dr. Lawshe, Mr. Ruch and Dr. Mobley all testified the study was performed in a professional manner.

The court finds Dr. Ramsay conducted an appropriate and professionally acceptable analysis of the data he gathered in connec-

tion with his original Lake Charles validity study.

Dr. Ramsay testified that one of the problems in conducting a criterion related validity study is the sample size. The sample size is the number of individuals who are included in the study. The statistical analysis used in these studies requires sufficiently large samples to give the investigator confidence in his results.

Dr. Ramsay found a statistically significant relationship between both the Wonderlic Test and the Bennett Test for both the production employees as a group and the maintenance employees as a group (PPG–Exh. 186, Tab 1). However, many departments, when considered as separate samples, contained too few individuals on which to base meaningful conclusions.

To solve this small sample size problem, Dr. Ramsay, working with Dr. William Mobley, conducted an analysis of the jobs and subjected the results of this analysis to a statistical procedure known as "cluster analysis."

This work was done for the purpose of grouping together similar jobs to enable Dr. Ramsay to reanalyze the original data using larger sample sizes.

Dr. Ramsay's and Dr. Mobley's report on the cluster analysis procedure was published in a professional journal. It was introduced into evidence as Appendix I to PPG–Exh. 187. Through the cluster analysis, Dr. Ramsay and Dr. Mobley identified four groups of jobs which were substantially similar.

Dr. Ramsay's and Dr. Mobley's method of grouping jobs was found to be appropriate by the expert witnesses who testified on this issue. Mr. Ruch, Dr. Lawshe and Dr. Sharf all agreed that this was an appropriate method for grouping jobs and that if the test were demonstrated to be valid for the cluster of jobs they were also valid for each job in the cluster. This conclusion was not disputed by plaintiffs' expert.

The court finds the cluster analysis done by Drs. Ramsay and Mobley is an appropriate and professionally acceptable method of grouping similar jobs. The court also finds that if jobs are grouped in this manner, tests found to be valid for the cluster are in fact valid for each job in the cluster.

The first three clusters identified by this procedure contained the jobs at the Lake Charles plant fed by the Utility Crew entry pool.

Dr. Ramsay reorganized the original data based on the results of the cluster analysis. He then subjected this data to the standard correlational statistical analysis used by psychologists to examine whether test scores are related to job performance.

Dr. Ramsay's report of this reanalysis of his original data was introduced as PPG–Exh. 187.

Dr. Ramsay found the following correlations between test scores and job performance (as measured by the performance (PFM) scales of the form 7900 ratings:

| | Cluster 1 | Cluster 3 |
|---|---|---|
| Wonderlic | .327 | .465 |
| Bennett | .271 | .370 |

(PPG–Exh. 187, Page 7, Table 4)

All of these correlations were significant at the required .05 level.

Although the sample size available for analysis for cluster 2 (20 persons) was still too small for appropriate analysis, Dr. Mobley testified that in his opinion the tests were validly related to job performance for the jobs in cluster 2 also. Mr. Ruch concurred in this opinion. Dr. Mobley and Mr. Ruch based their opinions on the results of the cluster analysis as well as their review of PPG–Exh. 186.

Dr. Outtz, in addition to criticizing the use of criterion form 7900 in the validity studies introduced as PPG-Exhs. 186 and 187, also criticized the study because the validation of the Wonderlic test was done in a "concurrent study" as opposed to "predictive" manner.

A "concurrent study" is not one in which the test score information is gathered substantially in advance of the gathering of the criterion.

Dr. Outtz testified that in his opinion a concurrent validity study was never adequate and that it could not be used as a substitute for a predictive study.

Dr. Outtz's opinion was contradicted by Dr. Lawshe, Dr. Sharf and Mr. Ruch.

Dr. Outtz was confronted with Division 14's Principles of Selection which include a paragraph to the effect that concurrent studies can give results substantially comparable to predictive studies.

The court finds that Dr. Ramsay's use of a concurrent validity strategy for validating the Wonderlic test was appropriate and in accord with professional practice.

PPG Exhibit 187 as explained by the testimony of Dr. Ramsay, Dr. Mobley and Mr. Ruch shows that the Wonderlic and Bennett tests are related to job performance for all of the jobs contained in clusters 1, 2, and 3 as listed on Table 4 of Appendix 1, PPG-Exh. 187.

The jobs in clusters 1, 2, and 3 cover essentially all of the jobs at PPG's Lake Charles plant for which Utility Crew employees are eligible. These jobs include the jobs in Departments 5A and 5C, the departments in which employees are responsible for monitoring and controlling the power generation at the plant; Departments 10A and 16A, the departments in which employees are responsible for manufacturing chlorine and caustic at the plant; Departments 60A, Plant B–I and B–II, the departments in which employees are responsible for producing organic chemicals including EDC; Department 80A, the department in which employees are responsible for the production of silica pigments; Department 11A (Lead Loader Line of Progression) the jobs in which employees are responsible for loading the hazardous chemicals of the plant; and Department 30A where apprentices and service mechanics perform the maintenance work for the plant.

The Wonderlic and Bennett tests have been demonstrated to be related to job performance in the jobs at PPG's Lake Charles plant which are fed by the Utility Crew entry pool.

A person's score on the Wonderlic and Bennett tests is predictive of how that person will perform in the jobs which are filled from the Utility Crew entry pool. The higher a person scores on the Wonderlic and Bennett tests, the better his predicted performance is on the jobs fed by the Utility Crew at PPG's Lake Charles plant.

The court finds PPG-Exhs. 186 and 187 demonstrate the Wonderlic and Bennett tests are valid job related selection devices.

Because of existing government guidelines, Dr. Ramsay set about to examine whether the Wonderlic and Bennett tests were related to job performance using a sample of black employees only. Because there was too small a sample of black employees in jobs for which the tests were being used in Lake Charles, Dr. Ramsay combined a sample of black chemical operators from the Lake Charles plant with a sample of black chemical operators from another PPG chemical plant located in Beaumont, Texas.

Dr. Ramsay testified that it was proper to combine these two groups because he had determined through the clustering procedure that the jobs at the two plants were substantially similar and that through an independent analysis (introduced at PPG–Exh. 189) he had determined the applicant populations at the two plants were similar. Dr. Outtz did not challenge this opinion.

The court finds it was appropriate for Dr. Ramsay to combine these two samples of black operators from PPG's Beaumont and Lake Charles plants in order to examine whether the Wonderlic and Bennett tests were valid predictors of job performance for blacks.

Dr. Ramsay gathered test score and job performance information on the black employees in the study. His report, introduced as PPG Exh. 188, shows the results of his statistical analyses.

For this separate group of blacks Dr. Ramsay found that both the Wonderlic and Bennett were valid tests. Dr. Ramsay found both tests were related to job performance at a statistically significant level

for blacks. Dr. Ramsay performed this study only for black operator employees.

Dr. Ramsay testified that at the time he conducted this analysis and as of the last time he had checked on the issue, it was not technically feasible to do this type of analysis for a separate group of black Service Mechanics. This testimony was not challenged by plaintiffs and is accepted by the court.

There was considerable testimony at the trial about whether there was any real need to undertake a study involving blacks only. Dr. Ramsay testified that in his professional opinion there was no need to conduct a separate study for blacks. He did the study for the purpose of attempting to comply with government guidelines.

Mr. Ruch testified about the history of this requirement. In the late 1960's psychologists developed and began to study a theory which hypothesized that paper and pencil tests worked differently for blacks than they did for whites. Originally psychologists hypothesized that while the tests might be valid predictors of job performance for whites they might not work at all for blacks.

Mr. Ruch described these hypothesis graphically. His graph was introduced as PPG–Exh. 203.

A valid predictive relationship between test scores and job performance can be graphically demonstrated as follows:

TEST SCORES

As can be seen, line I suggests the higher a given individual performed on a test, the higher job performance score he would obtain.

In the late 1960's some psychologists hypothesized that the following different relationships might exist for whites (I) and blacks (II) on the same test:

TEST SCORES

This hypothesis was known as "differential validity." Under this hypothesis the tests are shown to be valid for whites (Line I) (i. e., the higher a white scores on the test, the higher his expected job performance). However, for blacks, under this hypothesis (Line II), there is no relationship between test scores and job performance. Thus, no matter what a black scored on the test, he had the same predicted job performance.

This hypothesis was the subject of substantial study by psychologists from the time it was first proposed in the 1960's.

In the mid 1970's Mr. Ruch published a review of all of the studies done until that time. Mr. Ruch concluded that the overwhelming weight of authority on the issue was that the above described hypothesis could not be supported. In Mr. Ruch's opinion the results of these years of research on this issue showed that if paper and pencil tests were related to job performance for whites, they were also related to job performance for blacks.

Although Dr. Outtz testified there was still some possibility that differential validity might occur, Dr. Ramsay, Dr. Mobley, Dr. Sharf and Dr. Schmidt all agreed with Mr. Ruch that the professionals in the field, based on the accumulated research, had generally concluded the hypothesis of differential validity was not supported.

The court finds the professional opinion of industrial psychologists is that the hypothesis of differential validity has not been established to be true by research. The court finds there is no need to research this hypothesis in the context of each individual case because of the results of the accumulated research on this issue.

The Uniform Guidelines on Employee Selection Procedure require, where technically feasible, that an employer examine his use of tests to determine whether they are fair to all groups.

This requirement is based on a corollary hypothesis to the one discussed above. Under this corollary hypothesis it was assumed that tests might work differently for blacks than they did for whites and might thereby be unfair to blacks. The hypothesis states that while tests might predict job performance for blacks they might nevertheless be unfair to blacks in that a lower score on the test might predict the same level job performance for blacks as a higher test score did for whites.

The corollary hypothesis can be graphed for whites (I) and blacks (III) as follows:

TEST SCORES

Under this hypothesis it can be seen that although the tests are predictive for both groups, they are unfair to blacks because a given test score predicts a much higher performance level for blacks than it does for white.

Mr. Ruch also testified that this hypothesis had been thoroughly researched and found not to exist.

Plaintiffs' expert, Dr. James Outtz, testified that in his opinion while there were some studies to support Mr. Ruch's position, the issue was not free from doubt and that the hypothesis still required study.

Dr. Schmidt has personally studied this issue of differences in the validity of tests for whites and blacks. He published studies (introduced as Plaintiffs' Exhibit 35 and 36) showing that the hypothesis that tests are unfair to blacks cannot be supported by the accumulated research. Dr. Schmidt did a study in which he reviewed over 800 pairs of validity coefficients (one for whites and one for blacks) and based on this and other studies he concluded that tests such as the Wonderlic and Bennett tests are not unfair to blacks.

Dr. Sharf was also of the opinion that the hypothesis should be rejected (PPG–Exh. 192 pg. 38). He further stated that the profession as a whole had rejected the hypothesis.

The court finds the hypothesis that tests are unfair to blacks has been investigated and rejected by the overwhelming majority of professional industrial psychologists.

■ The court finds this requirement in the guidelines is inappropriate and should not be required of test users because of the fact that the factual basis for the requirement, i. e., that paper and pencil tests will somehow work differently for blacks than they do for whites, has been demonstrated by the professionals in the field to be inaccurate.

Further, even if there is such a requirement, in this case the court was presented with an analysis of the fairness of the Wonderlic and Bennett tests for PPG's Lake Charles plant.

Mr. Ruch, using Dr. Ramsay's data, analyzed the separate validity statistical evidence for white employees and black employees. Mr. Ruch examined whether the Wonderlic and Bennett tests were valid for both blacks and whites and further by using a statistical technique, known as the Wilkes-Guilliksen analysis, examined whether the tests were fair to blacks.

Based on his analysis Mr. Ruch concluded that PPG's use of the Wonderlic and Ben-

nett tests in Lake Charles was valid and appropriate. He found that the tests were predictive of job performance for the jobs studied for both blacks and whites and that the use of the tests was not unfair to blacks.

Although plaintiffs' expert, Dr. Outtz, testified that Mr. Ruch used only one of the several definitions of "test fairness," known as the Cleary definition, in making this analysis, Dr. Outtz failed to make any analysis using any other definition and failed to testify as to any analysis showing the tests were unfair to blacks.

Further, in response to Dr. Outtz's criticism, Mr. Ruch re-analyzed the data using another definition of test fairness, known as the Thorndike definition, and found that the tests were also fair under this definition.

Dr. Outtz failed to offer a preferred definition of test fairness. Mr. Ruch and Dr. Schmidt both testified that the Cleary definition was the best definition. The Cleary definition is the one adopted by the Uniform Guidelines on Employee Selection.

■ The court finds that the Cleary definition is the appropriate method of examining test fairness and that PPG's use of the Wonderlic and Bennett test was fair under the Cleary definition.

Subsequent to the conclusion of his original work Dr. Ramsay had the opportunity to further investigate the validity of the Wonderlic and Bennett tests at the Lake Charles plant.

Under Dr. Ramsay's supervision, PPG contracted with Dr. James Farr, a professor of psychology at Penn State University to develop employee rating forms using a technique to create what are known as Behaviorally Anchored Rating Scales or BARS.

Dr. Farr developed these scales in the normal professionally acceptable manner. (PPG-Exh. 191).

Supervisory ratings on a group of operators in the production departments were gathered from Lake Charles supervisors. Additionally, performance scores on chemi-

cal operator training tests were gathered. This "criteria" information was available to Dr. Ramsay.

Dr. Ramsay re-analyzed the validity of the Wonderlic and Bennett tests using the BARS and training scores as criteria.

Dr. Ramsay gathered the test scores of the employees contained in the study and subjected the test score and criteria information to the standard accepted statistical analysis discussed above. Dr. Ramsay's report on this study was introduced as PPG–Exh. 190.

As a result of his statistical analysis Dr. Ramsay again confirmed that both the Wonderlic and Bennett tests were predictive of job performance for the operator jobs at PPG's Lake Charles plant. Dr. Ramsay found correlations at the statistical significance level of .05 required by professional practice and the Uniform Guidelines. Not only did Dr. Ramsay find that the tests predicted job performance as measured by the BARS ratings, but he also found that both the Wonderlic and Bennett tests predicted how a person would score on the training tests.

Dr. Ramsay found the Wonderlic and Bennett tests also predicted how employees would do on the training tests, a separate measure of learning ability, at the required .05 level of statistical significance. These training tests were part of the information gathered at the Operator Training School attended by all employees entering the power, chlorine production, organics and pigments departments.

Dr. Ramsay's analysis showed a person's Wonderlic and Bennett scores were predictive of how much an individual could learn in the training course.

Dr. Ramsay also analyzed whether a person's performance on the training tests was predictive of subsequent job performance as determined from supervisory ratings using the BARS rating scales. This analysis also resulted in significant findings demonstrating that the training tests were also related to job performance.

Dr. Outtz, plaintiffs' own expert, failed to offer any criticism of the BARS validity study, terming it "better than many validity studies he had seen." Dr. Outtz found the development of the rating scale used in the study to have been done in an acceptable manner. Further, he found the use of the BARS was done in a professional and appropriate manner in the study.

Dr. Outtz further agreed that PPG Exh. 190 showed the Wonderlic and Bennett tests were predictive of both job performance and training performance at a statistically significant level.

The court finds the BARS study reconfirms the conclusions based on Dr. Ramsay's earlier studies, that is, the Wonderlic and Bennett tests are job related selection devices which predict an individual's performance in the highly skilled complex jobs fed by the Utility Crew at PPG's Lake Charles Chemical plant.

## PLAINTIFFS' CRITICISMS OF PPG'S VALIDITY EVIDENCE

Plaintiffs' expert, Dr. James Outtz, levelled a number of criticisms at PPG's evidence of validity. It should be noted however, that Dr. Outtz admitted that PPG had sufficient evidence of validity to justify making "conditional" decisions as to who should be eligible for the Utility Crew based on their test scores on the Wonderlic and Bennett tests. Dr. Outtz's admission that PPG should be allowed to use the tests conditionally suggests that he even agreed that there was a demonstration the tests were job related.

Dr. Outtz also admitted that when there is a positive statistical correlation between the test scores and job performance, such as the court has found to exist in this case, that psychologists conclude that persons who score higher on the test are predicted to have higher performance levels.

Dr. Outtz criticized PPG's use of cut-off scores of 15 on the Wonderlic and 25 on the Bennett as being inappropriate.

Because the relationship between the test scores and job performance is not perfect, there are some individuals who obtain better job performance ratings than other employees who had higher test scores.

Dr. Outtz pointed out examples of this in the validity information submitted by the company. However, Mr. Ruch testified that no selection device is perfect. There are always some errors in prediction.

Dr. Schmidt analyzed the amount of dollars saved in terms of productivity that PPG gained by using the tests with the cut-off scores of 15 on the Wonderlic and 25 on the Bennett. Using the information contained in the validity studies presented by PPG and standard statistical formulas Dr. Schmidt was able to project the increased productivity PPG gained by using tests which selected the better employees.

Relying on his analysis and using an hourly pay rate which was actually lower than the one in effect at PPG at the time of trial, Dr. Schmidt concluded that by using the Wonderlic Test with a qualifying score of 15 and the Bennett test with a qualifying score of 25, PPG was able to obtain several hundred thousand dollars a year in increased productivity over what it could achieve if it had not used the tests.

Further, Dr. Schmidt testified the amount of increased productivity PPG enjoyed would be reduced if the cut-off scores on the tests were lowered. Dr. Schmidt's analysis was not challenged by plaintiffs.

Dr. Schmidt's analysis shows and the court finds that PPG's use of the Wonderlic and Bennett tests has resulted in substantial practical benefits for the company. The use of the tests with cut-off scores of 15 on the Wonderlic and 25 on the Bennett is clearly justified by PPG's legitimate interest in substantially increasing productivity.

Dr. Ramsay testified he set cut-off scores as low as they could be set and still serve the plant's need to select employees for the Utility Crew who were capable of learning and performing the skilled jobs in the plant in a safe and efficient manner.

The court finds PPG's use of the qualifying scores of 15 on the Wonderlic and 25 on

the Bennett are reasonable and job related requirements. Using these scores as prerequisites for entry into the Utility Crew is justified in that it protects PPG's legitimate business interest in having a productive, safe, and efficient work force.

Dr. Outtz also criticized Dr. Ramsay's initial validation study (PPG-Exh. 186) because Dr. Ramsay failed to include employees from the yard crew jobs in the study. However, Dr. Outtz admitted on cross examination that it was not possible to include these persons in the study because supervisory ratings could not be obtained on them. Dr. Outtz did not criticize the sample used in the BARS study (PPG-Exh. 190).

Dr. Ramsay testified that he obtained ratings on as many employees as he could to conduct his original validation work. He included as many employees as was technically feasible in this study.

Dr. Outtz also testified that while the tests might be used to make conditional decisions on an employee's eligibility for the Utility Crew, the company should investigate alternative methods by which employees could qualify for selection. The question of alternative selection procedures was also the subject of substantial expert testimony in the trial.

Dr. Lawshe testified that in his years of experience in this area he had never seen an alternative device which could accurately and efficiently screen and select employees for entry level complex industrial jobs as well as paper and pencil tests such as the Wonderlic and Bennett test.

Dr. Outtz testified about three different types of selection devices which he believed should be examined for validity at the Lake Charles plant. These alternative devices were (1) bio-data systems, (2) work sample tests, and (3) trainability tests.

Dr. Outtz testified that a bio-data system was an alternative procedure which could be used at PPG's plant. To support his testimony Dr. Outtz introduced a chapter from an industrial psychology handbook on the use of bio-data for selection. However,

the articles submitted by Dr. Outtz had few if any references to works or studies showing the use of bio-data for selection of persons for chemical operator jobs or for any manufacturing or industrial jobs.

Dr. Mary Lewis, a student of the author of the work cited by Dr. Outtz, had extensively studied and done her doctoral dissertation on bio-data selection systems. She testified that generally bio-data systems were not considered for use for selection for industrial jobs. This opinion was supported by Mr. Ruch.

There was uncontradicted testimony, and the court finds, that bio-data selection systems were not even available for the selection of manufacturing employees at the time Dr. Ramsay commenced his validation work.

Further, based on Dr. Lewis' description of how a bio-data system is developed and validated, including the number of items which must be developed and studied and the number of individuals who must be included in the study, the court finds that it was and is totally impractical for PPG to develop and implement such a system at the Lake Charles plant. Further, there was no evidence showing that any specific bio-data selection system would be valid at the Lake Charles plant or that its use would result in the absence of disparate impact.

The court finds that a bio-data selection system is not a suitable alternative selection procedure for use at PPG's Lake Charles plant to select employees for the Utility Crew.

The second alternative cited by the plaintiffs was the use of so-called work sample tests.

These tests use a small part of the job as a "test" to determine if an individual can perform the job. Dr. Outtz also referred to a number of professional writings to support this alternative. One of the articles cited by Dr. Outtz was written by Dr. Schmidt.

Dr. Schmidt testified that his article and the other articles cited by Dr. Outtz involved situations where an employer was

seeking to measure job knowledge already possessed by an employee. In Dr. Schmidt's opinion this type of test was not useful in selecting untrained applicants for entry level jobs where the company expected them to be trained for higher level, more complex jobs after employment. Mr. Ruch concurred in this opinion.

Again, plaintiffs failed to identify any specific work sample test that they felt may be appropriate for use at the Lake Charles plant and further failed to show any such test existed that was job related and/or would have a lesser disparate impact than the Wonderlic and Bennett.

Dr. Outtz admitted that work sample tests would not be practical to use in screening applicants off of the street for Utility Crew jobs. Dr. Outtz however, did contend that the test could be used for selecting people to move from the Yard Crew to the Utility Crew. However, he failed to offer any logical or practical method by which this could occur.

Both Dr. Schmidt and Mr. Ruch testified that in their opinion work sample tests were not appropriate or suitable alternative selection devices for selecting either applicants or Yard Crew employees for vacancies in the Utility Crew.

Further, one of the very studies cited by Dr. Outtz to support his position unequivocably states that tests of general ability (such as the Wonderlic and Bennett) are better suited for selecting applicants who do not possess any of the job skills and who must learn them through training and instruction.

The court credits the testimony of Dr. Schmidt and Mr. Ruch on this point and finds that "work sample" tests are not suitable alternative selection procedures for use by PPG in selecting either applicants or Yard Crew employees for the Utility Crew.

The final alternative proposed by Dr. Outtz was classified as trainability tests. Dr. Outtz also cited articles to support his citation of trainability tests as a suitable alternative selection device.

Again plaintiffs failed to offer any evidence showing that such a test would be as job related as the Wonderlic and Bennett tests and also have a lesser disparate impact.

Further, most of the articles cited by Dr. Outtz involved tests which were given to people who were already selected for employment and already in a training program.

This obviously is not suitable for selecting the individuals who should be put in the training program in the first place.

Further, the only articles cited by Dr. Outtz which studied the use of trainability tests to select persons for training programs found that although these tests did predict training success, general ability tests such as the Wonderlic and Bennett tests were superior to the trainability tests in predicting subsequent job performance.

Further, Dr. Outtz admitted the company had specific evidence showing the Wonderlic and Bennett tests predicted a person's ability to learn. This was the same ability Dr. Outtz testified could be measured by a trainability test.

Mr. Ruch testified he had reviewed the trainability articles cited by Dr. Outtz and found that, in his opinion, they did not support the conclusion that trainability tests would be a suitable alternative procedure to the use of the Wonderlic and Bennett at PPG's Lake Charles plant.

The court credits the testimony of Mr. Ruch on this point and finds trainability tests are not a suitable alternative selection procedure for use in selecting Utility Crew employees at PPG's Lake Charles plant.

Having examined and rejected the alternative selection procedures proposed by plaintiffs, and considering the testimony of the expert witnesses, the court finds there are no known alternative selection procedures to the use of general ability tests such as the Wonderlic and Bennett tests which would equally and as efficiently serve PPG's legitimate business needs in accurately selecting employees for the highly complex and hazardous jobs fed by the Util-

ity Crew at PPG's Lake Charles plant all of which jobs require extensive on the job training and formal instruction with written manuals in order to properly familiarize the employee with the necessary information to enable him to safely and efficiently perform his job.

Dr. Outtz also criticized PPG's use of the Wonderlic and Bennett tests because PPG failed to make alternative uses of these tests. However, Dr. Outtz admitted that PPG had made one alternative use of the tests by lowering the cut-off scores to the present levels of 15 on the Wonderlic and 25 on the Bennett test. He suggested that another alternative use of the tests would be to use just one of the tests, not both of them.

Mr. Ruch explained the Wonderlic and Bennett tests measured different abilities. This point was not contested by Dr. Outtz. Mr. Ruch further explained that using both tests gave the company a more accurate or better prediction of the applicant's job performance. Thus, in Mr. Ruch's opinion using both tests was a superior selection system than using only one of the tests.

This issue highlights the problem the court was presented with in this case by plaintiffs' suggestion of alternative procedures and alternative uses of the present tests. Plaintiffs presented to the court, without any clear showing of the relevancy, practicality or job relatedness, a number of suggested alternative systems they contended PPG should use. Plaintiffs' expert admitted PPG made one alternative use of the tests. However, plaintiffs suggested another. Had PPG used this alternative would plaintiffs be prevented from merely suggesting another? Plaintiffs' approach suggests a meaningless and endless cosmic search for possible alternatives.

The court finds that plaintiffs' criticisms of PPG's failure to consider alternative selection devices or alternative uses of the Wonderlic and Bennett is without merit.

There was no showing or even an indication that Dr. Ramsay selected these tests for the purpose of discriminating against blacks. Dr. Ramsay selected the tests be-

cause they were professionally developed tests which he believed, based on his knowledge of the tests and the jobs at the Lake Charles Chemical Plant, would accurately predict job performance for the broad range of skilled jobs at the plant. His belief was proven to be accurate by the validity studies he performed.

## COMPLIANCE WITH UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES

Dr. Lawshe testified that he had reviewed the validity studies done by Dr. Ramsay to determine if they complied with the criterion related validity requirements of the Uniform Guidelines on Employee Selection Procedures and concluded they complied with the Guidelines. Mr. Ruch concurred in this opinion.

Dr. Outtz criticized the studies for failing to comply with some of the requirements of the Guidelines. For example, Dr. Outtz noted that Dr. Ramsay had given raters some instructions when he used the 7900 rating form to gather the ratings but had not included these in the report.

The Uniform Guidelines require that instructions to raters be included in the report on validity, presumably so they can subsequently be reviewed by other psychologists. However, this requirement was not in effect at the time Dr. Ramsay commenced his study or at the time he gathered the form 7900 ratings. Further, he testified about the instructions he did give, so this information was available.

Dr. Outtz's other challenges to PPG's compliance with the Uniform Guidelines involve the issues discussed above as to (1) whether the criterion or ratings used were adequate and complied with the Guidelines, (2) whether the company investigated alternative procedures and alternative uses of the tests, and (3) whether PPG's use of the tests was justified by the validity evidence.

The court finds the 7900 criteria rating form is appropriate for use under the Uniform Guidelines based on the testimony of Dr. Lawshe, Mr. Ruch, and Dr. Sharf.

At the time Dr. Ramsay commenced the validation study, there was no guideline or regulation requiring him to investigate alternative procedures. Certainly Dr. Ramsay cannot be faulted for not complying with a standard that did not exist.

The court finds PPG's evidence of validity amply supports its use of the tests. Dr. Schmidt's uncontradicted testimony demonstrates a substantial, legitimate and practical business justification for using the tests.

Dr. Outtz failed to identify a single part of the guidelines with which the BARS study (PPG-Exh. 190) failed to comply.

The court finds that PPG's evidence on validity including PPG-Exhs. 186 through 194 in addition to the testimony of the expert witnesses establishes that PPG has complied with the requirements contained in the Uniform Guidelines on Employee Selection Procedures published by various federal agencies.

## CONCLUSION ON VALIDITY

PPG has, since at least 1968, conducted a substantial and ongoing effort to analyze its use of tests to insure they are job related.

The volume of the evidence of job relatedness of these tests alone suggests to the court that substantial time and effort have been invested in this study. The fact that the results of the original study was re-examined demonstrates PPG's interest in continuing to insure the tests are in fact job related.

Based on all of the evidence submitted, the court finds that PPG has amply demonstrated that its use of the Wonderlic and Bennett tests is in fact job related and supported by substantial and legitimate business justification.

## PLAINTIFFS' ALLEGATION OF DISPARATE TREATMENT IN THE USE OF TESTS

Plaintiffs also alleged that PPG's requirement that blacks employed in the Yard Crew before October of 1969 exceed the qualifying score of 15 on the Wonderlic before they can transfer to the Utility Crew is unlawful because white employees who were employed before 1969 in the Utility Crew were not required to obtain a score of 15 in order to retain their jobs.

Plaintiffs characterize the change from the Otis test to the Wonderlic test as a "new hurdle" which should not be applied to blacks already employed at the time of its adoption.

Before the company transferred to the Wonderlic test all applicants were required to obtain a score of forty-five (45) on the Otis test to be eligible for the Utility Crew.

Dr. Ramsay testified the Otis test was a professionally developed test which examines an individual's reading, mathematical and learning ability. He stated the Otis test and the Wonderlic test are very similar in content. He further testified that scores on the two tests can be compared and that a score of 15 on the Wonderlic is lower than a score of 45 on the Otis. This evidence was unchallenged by plaintiffs and is accepted by the court.

Rather than creating a new hurdle by changing to the Wonderlic test PPG merely changed from one general aptitude test to another similar general aptitude test. Both before and after this change both blacks and whites were required to obtain the same scores on the tests in order to qualify for the Utility Crew.

At all times relevant to this action all employees who were hired into the Utility Crew were required to score a 15 on the Wonderlic test and a 25 on the Bennett test.

Accordingly, the court finds plaintiffs' allegation of disparate treatment in the use of tests is without merit.

## SUPERVISORY PROMOTIONS

The first level supervisors at the plant are responsible for advising and assisting the employees in carrying out their day to day operating responsibilities and making decisions concerning significant operational and maintenance problems.

Because of the complexity of the operations in the skilled lines of progression and

the hazardous nature of the chemical processes, the company only selects rank and file employees for supervisory positions over a particular skilled progression line from among those employees with extensive work experience with the types of equipment and chemical processes controlled by the employees in that progression line.

In all but a few cases the employees have been Lead Operators or Service Mechanics in that progression line before being promoted to a supervisory position. In the few exceptions, the employee has been a lead operator in one of the other skilled progression lines and has had extensive experience with the chemical processes and the type of equipment used in the progression line he was selected to supervise.

PPG–Exh. 178 is a list of every hourly employee promoted to supervisor from October of 1969 to October of 1978. This list shows each individual's name, race, date of promotion, the job the individual held before he was promoted and the department he was promoted into. Mr. Frank Ludden testified about each instance on the list where an individual was promoted from lead operator in one department to supervisor in another department. In every instance this occurred it was caused by some unusual occurrence such as the start up of a new plant operation.

The only other group of employees from which first level supervisors are selected are the technical assistants who are degreed chemical engineers. However, even with their extensive educational background they are not permitted to act in a supervisory capacity without first actually working with the lead operators in the progression line for a period of time, often a year or more.

I find that in view of the complex and hazardous nature of the operations, the company's practice of only selecting as first level supervisors over the skilled progression lines from among the Lead Operators (or in the case of the Maintenance Department from the Service Mechanics) in the progression line is essential to the safe and efficient operation of the plant.

Mr. Ruch also prepared a standard deviation analysis relative to the supervisor promotion issue, (PPG–Exh. 201), similar to the ones he prepared on the hiring and job assignment issues.

■ The court finds Mr. Ruch properly determined the relevant labor market (RLM, Column 2) for this analysis by considering only the Lead Operators in each operations department and all Service Mechanics in the Maintenance Department as being available for promotion. This conclusion is based on the court's finding that it is essential for the safety and efficiency of the plant for supervisors to be highly experienced in the operation or maintenance work they are called on to supervise.

Mr. Ruch calculated the standard deviation analysis for each of the departments. In no case did the promotion of blacks vary by more than two standard deviations below what would be expected by chance based on the available percentage of blacks in the appropriate labor pool. Further, for a number of departments the court finds that blacks were promoted to supervisors in excess of the numbers which could be expected based on chance alone.

Mr. Ruch testified that based on his calculations, in his opinion the statistical evidence demonstrated no reason to infer that race was a factor in the promotion of persons to supervisory positions.

■ The court finds the statistical evidence does not support an inference that blacks were excluded from supervisory positions because of their race and they have not been discriminated against by being denied promotions to supervisory positions.

Plaintiffs also allege they were paid less money for harder work at PPG. The pay rates for each job classification are set out in the collective bargaining agreement. There was no allegation by plaintiffs and no evidence introduced showing that any individual had ever been paid at a rate other than the rate established for the individual's job classification.

Plaintiffs offered testimony concerning three areas where they contend employees in the Yard Utility Crew Line of Progression generally perform work which is similar to work performed by employees in the Utility Crew Line of Progression and for which Yard Utility Crew employees are paid less money than Utility Crew employees. These three areas are:

A. The cell repair jobs are alleged to be similar to the pipe fitter and rigger service mechanic jobs in the Maintenance Department, and to the operator jobs in the Production Department responsible for making chlorine gas, caustic soda and hydrogen.

B. The caustic rack helper job is alleged to be similar to jobs in the Shipping Department Progression Line responsible for loading chlorine gas, vinyl chloride and the other chemicals produced at the plant.

C. The swamper job is alleged to be equal to the rigger job in the Maintenance Department.

Additionally, a number of plaintiffs contend that they, as individuals, have been denied equal pay for performing the same jobs as whites.

CELL REPAIR JOBS ARE SIMILAR TO THE RIGGER AND PIPE FITTER SERVICE MECHANIC JOBS IN THE MAINTENANCE DEPARTMENT AND TO OPERATOR JOBS IN THE PRODUCTION DEPARTMENT

Plaintiffs contend certain parts of the cell cut-out and cell renewal jobs in the Mercury Cell and Diaphragm Cell progression lines are similar to pipe fitter work, rigger and heavy equipment operator work performed by the Service Mechanics in the Maintenance Department.

The evidence, however, clearly established the levels of skill, judgment, responsibility and principle duties of these jobs are quite different. The Service Mechanics with pipe fitter craft skills are required to fabricate pipe in accordance with complex piping diagrams into the intricate mazes of different types and sizes of pipes used in a chemical plant. Further, the pipe fitters are often required to decide the appropriate layout of piping systems. The work requires considerable skill and employees seeking to learn the craft must complete the four year formal apprenticeship program. Because of the hazardous nature of the chemical plant operations, improper use of the types of pipe valves and related parts, and the improper layout or fabrication of the pipe can cause significant risks of explosion or the release of poisonous and flammable gas.

On the other hand, only a very small portion of the work performed by the cell cut-out and cell renewal jobs involves working with pipes. Even on those occasions, all the employees are required to do is to unscrew a standard section of pipe and replace it with an identical section that has already been fabricated. Even the selection of the pieces of pipe is relatively simple since the pieces of pipe are identical and in the same location and are replaced the same way on each of the hundreds of cells. The evidence fully establishes this work as well as all of the other tasks can normally be learned in a few weeks.

Although some of the plaintiffs testified concerning what they thought Service Mechanics do, it was clear they did not work around the Service Mechanics on any regular basis and were not able to testify credibly concerning that type of work.

Accordingly, the court finds plaintiffs' contention that the cell cut-out and cell renewal jobs are similar to the pipefitter job to be totally without merit.

Plaintiffs also claim part of the cell cut-out and cell renewal jobs are similar to the rigger and heavy equipment operator work performed by the Service Mechanics. In support of this, they offered testimony that these employees attached hooks on overhead cranes onto cell parts and transported them back to the cell repair room.

The evidence clearly establishes that, in most if not all cases, the cell parts being lifted had eyes already attached to the cell part and all that was required was to place

the hook into the eye. The evidence further establishes these eyes were identically placed on each of the identical cells and no judgment or skill was involved in where or how to place the hooks in the eye. The part is transported back to the repair room by an overhead crane operated by buttons that cause the crane to go forward or backwards and to traverse.

The court finds these duties are totally different in complexity, level of skill, judgment and consequences from the rigger and heavy equipment operator jobs. As discussed in more detail previously, these jobs require the lifting of huge pieces of equipment, sometimes 10 to 15 feet in diameter and weighing many thousands of pounds 60 to 80 feet in the air within tolerances of less than an inch within the operating areas.

Based on the testimony presented by plaintiffs, it was apparent their attempt to show these cell renewal and cut-out jobs were like the Service Mechanic jobs was totally unfounded.

Plaintiffs also contend that cell repair jobs are similar to that of operator jobs. Plaintiffs offered no credible evidence to support this contention, and for the reasons previously discussed concerning the duties, levels of skill and judgment in these jobs, the court finds the contention to be totally without merit.

Viewing the testimony as a whole, it is obvious the plaintiffs are claiming that because cell repair personnel, on occasion, perform a specific task which is similar to a task they have seen, on occasion, performed by Service Mechanics, that, therefore, the jobs are similar.

The court finds the evidence fails to prove these jobs are substantially similar.

### SHIPPERS AND CAUSTIC RACK HELPER JOBS ARE SIMILAR TO LOADER JOBS

Plaintiffs also allege that employees who work in the Shipper Line of Progression, including the caustic rack helper, perform work similar to that performed by the loader and loader helpers but are paid less. For the reasons discussed previously, the court finds this claim to be without merit.

### SWAMPER JOB IS SIMILAR TO RIGGER JOBS

Although plaintiffs failed to propose any findings of fact on the similarity of the swamper and rigger job, they did offer evidence that the jobs of swamper and rigger are similar. For the reasons previously discussed, the court finds this contention to be without merit.

The court further finds there has been no discrimination in pay involving these positions.

*INDIVIDUAL CLAIMS*

### CLAIM OF AMOS COVERSON

Plaintiffs allege Mr. Coverson has been performing the same job as his alleged supervisor but is paid at a lower rate of pay.

The testimony of Amos Coverson on this issue was not supported by a proper foundation nor was it credible.

Although in their proposed finding of fact on this issue, plaintiffs suggest Mr. Coverson performed the same work as his "supervisor," in his testimony Mr. Coverson alleged he performed the same work as Mr. Herbert Godeaux. Mr. Coverson testified that Mr. Godeaux was classified as a "field engineer." However, the personnel record introduced by plaintiffs as part of Pl.-Exh. 4 shows that Mr. Godeaux was classified as an "iss. & Receiving Clerk II."

Although Mr. Coverson alleged he was paid less than Mr. Godeaux he testified that he had no idea how much Mr. Godeaux was paid. The plaintiffs failed to show any discriminatory pay practices with respect to Amos Coverson.

### CLAIM OF WILLIAM LAVERGNE

Plaintiff W. LaVergne testified that while classified as a painter specialist he painted drums with a black paint but was paid less than service mechanic painters. Mr. LaVergne's testimony shows that the last time he engaged in painting work while a PPG employee was prior to 1972.

Thus, Mr. LaVergne's pay discrimination claim on this point is not timely. Plaintiff showed there was no violation within or at any time near the time period covered by this action.

Further, as discussed previously, Mr. LaVergne's testimony showed he repeatedly painted the same type of surface with the same paint. This repetitive work is not substantially similar to the job of a painter which requires knowledge of various types of paints, surfaces, and blasting equipment.

## CLAIM OF MELVIN LUBIN & WILLIAM RENE

Melvin Lubin and William Rene are classified as oilers. Plaintiffs claim these individuals performed Service Mechanic work while employed by PPG.

Contrary to plaintiffs' proposed finding of fact, Mr. William Rene did not testify he had performed the job of Service Mechanic. Melvin Lubin did claim that he performed the same job performed by a Mr. Butler. However, Mr. Lubin also admitted that Mr. Butler could and did perform a number of tasks which Mr. Lubin did not perform.

Thus, while Mr. Lubin was responsible for replacing oil in certain pieces of machinery according to a set schedule, Mr. Butler was a skilled maintenance mechanic and was required to disassemble and repair various complex pieces of machinery such as compressors and motors.

Accordingly, the court finds that Mr. Lubin did not perform the same or a substantially similar job as that performed by Mr. Butler.

Plaintiffs failed to provide any comprehensive analysis, expert or other, of the jobs they claimed to be similar. Further, even as to the jobs about which plaintiffs offered specific evidence, the plaintiffs' own witnesses admitted there were substantial differences in the jobs on cross examination.

Repeatedly, plaintiffs' general claims of similarity were shown to be frivolous when plaintiffs themselves described the jobs alleged to be similar. Other plaintiffs, after claiming two jobs were similar, admitted they were only familiar with a small part of the duties of one of the jobs.

The plaintiffs' failure to offer meaningful evidence on this issue, combined with the fact that the evidence plaintiffs did introduce actually tended to disprove this allegation, convinces the court that plaintiffs' pursuit of this issue was frivolous.

## TRAINING

Plaintiffs allege they were denied training opportunities by defendant PPG. The allegation of denial of training involves three distinct issues which are: (a) denial of entrance into the apprenticeship program, (b) denial of on-the-job training to black employees and, (c) the fact that black cell repair employees were allegedly required to train white employees.

## ADMISSION INTO APPRENTICESHIP PROGRAM

Plaintiffs' own statistical evidence (Pl.-Exh. 17) shows the following numbers and percentages of blacks entering the apprenticeship program each year from 1970 through 1978:

| | TOTAL ENTERING PROGRAM | BLACK ENTERING PROGRAM |
|---|---|---|
| 1970 | 17 | 2 11.76% |
| 1971 | 5 | 1 20% |
| 1972 | 11 | 1 9% |
| 1973 | 4 | 4 100% |
| 1974 | 12 | 3 25% |
| 1975 | 13 | 3 23% |
| 1976 | 23 | 4 17% |
| 1977 | 26 | 1 4% |
| 1978 | 8 | 2 25% |

Mr. Frank Ludden, the plant's Industrial Relations Manager, testified that as of the date of his testimony approximately 28% of

the individuals in the apprenticeship program were black.

Although in some years (1970, 1972, 1977) the percentage of blacks admitted into the apprenticeship program was slightly less than the percentage of blacks in the general population, 21.6%, in other years the figure was substantially higher than the general population figure. (1973, 1974, 1975 and 1978). Further, PPG hired substantial numbers of black apprentices both before and after this civil action was commenced.

■ Based on the foregoing statistical evidence, the court finds there is no basis to infer blacks have been excluded from the apprenticeship program because of their race.

Plaintiffs' only other evidence in support of this allegation concerning discrimination was testimony from a number of named plaintiffs that they "desired" to get into the apprenticeship program or they "felt" they could perform service mechanic work if they were trained to do so. This testimony is not relevant to the issue of whether blacks as a class had been excluded from the apprenticeship program.

Accordingly, the court finds no evidence to support the conclusion that blacks were excluded from the apprenticeship program because of their race. On the contrary, the statistical evidence introduced for the years 1970 to the present supports the conclusion that blacks have not been denied entrance into the apprenticeship program because of their race.

## DENIAL OF ON THE JOB TRAINING TO BLACKS

■ Plaintiffs also alleged that blacks were denied training. The evidence presented demonstrated that all employees received on-the-job training appropriate to the job they were assigned. A number of the plaintiffs testified that they had been given training when they were assigned a job.

The court finds that black employees were given on-the-job training.

Only four individual plaintiffs testified that they were denied training by the Company.

Mr. William LaVergne testified that he had been denied training while he was on a trial period for the job of Swamper.

Mr. LaVergne testified that he was denied training as part of a conspiracy between two co-employees who were trying to keep him out of the job.

After Mr. LaVergne failed his trial period, another black employee, a Mr. Willis, was promoted to this job. Mr. LaVergne's testimony concerning a conspiracy was so incredible as to not be worthy of belief. Further, even if his testimony were taken as true there is no indication that Mr. LaVergne's race was the cause of the conspiracy nor was there any evidence to suggest that the company participated in or even knew of the conspiracy.

Mr. LaVergne's testimony does not support the allegation that blacks were denied training because of their race.

Mr. Clifford Collins testified that he had not received any training for the jobs he held at PPG. His testimony consisted of this simple denial. He did not describe training he was denied nor did he describe the training which whites in his job classification were given but he was not. Mr. Collins' testimony on this point was contradicted by other plaintiffs who testified they did receive training. In view of this and Mr. Collins' demeanor, the court does not find his testimony creditable.

Mr. Carlton White testified that he had never received any training for jobs fed by the Utility Crew. Mr. White is employed as a Janitor. There was no showing that any white employee, while classified as a Janitor, had been given any training for jobs fed by the Utility Crew. Mr. White's testimony does not support the contention that blacks were denied training because of their race.

Finally, Mr. Jesse Dixon testified that he did not receive proper training while he was an Apprentice Pipefitter. Mr. Dixon's testimony was not credible. His testimony at

trial was inconsistent with his pre-trial deposition. Further, although he testified that he was denied proper training, he also claimed he learned sufficient information to be promoted to a journeyman within two years after he started his apprenticeship program.

Mr. Ray Burkhart, the company official who was responsible for the apprenticeship assignments of Mr. Dixon, testified that Mr. Dixon complained to him that he was not obtaining sufficient "fabricating work" while an apprentice. Mr. Burkhart testified he took steps to address this problem by assigning Mr. Dixon to jobs involving fabricating work. Mr. Burkhart also testified that he personally followed up and observed Mr. Dixon performing fabrication work on these assignments.

There were a number of complaints from journeymen assigned to train Mr. Dixon to the effect that Mr. Dixon did not cooperate, did not appear to be seriously interested in learning to be a pipefitter, and expected everyone to do his work for him.

PPG introduced personnel records concerning Mr. Dixon's tenure as an apprentice. (PPG–Exh. 182). These records show that Mr. Dixon had difficulty learning to be a pipefitter apprentice, and that he received a substantial amount of fabrication work despite his complaints to the contrary. Mr. Dixon's testimony does not support the contention that blacks were denied training.

The court finds that plaintiffs failed to prove that blacks as a class or any of the individuals who testified about this allegation were denied on-the-job training at PPG.

### BLACK CELL REPAIR EMPLOYEES REQUIRED TO TRAIN WHITE EMPLOYEES

 A number of plaintiff-witnesses testified that they were required to train white employees how to perform a job. There was no showing that whites were not required to train blacks. To the contrary there was evidence concerning a number of instances where whites gave blacks on-the-job training. All new employees in each production department were given on-the-job training by the incumbent employees in that department.

Plaintiffs specifically allege that black cell cut-out personnel in the Diaphragm Cell Progression Line were required to train white Auxiliary (D level) Operators in the Chlorine and Caustic Soda Production Department in the diaphragm cell area.

The plaintiff witnesses testified that cell cut-out personnel were required to show Auxiliary Operators how to "cut-out" and properly "line up" a cell.

Mr. E. J. Tullier, a past superintendent over this area testified that cell cut-out personnel would be requested to teach Auxiliary Operators how to cut out a cell in cases where a cell had to be "cut-out" on the evening or night shift when no cut-out personnel were available to do this work. Auxiliary Operators were also required to check to insure cells were "lined up" correctly. However, these tasks were only a small portion of the Auxiliary Operators' job.

The court finds that blacks were required to train white employees. However, whites were also required to train black employees. There is no showing that this practice was conducted in a discriminatory manner. PPG did not discriminate against blacks by denying them training.

### DISCHARGE

Plaintiffs also alleged that defendant PPG discriminated against plaintiffs and the class they represented by discharging and/or forcing blacks to resign for reasons which would not result in the discharge of whites in similar circumstances.

In support of this allegation plaintiffs relied on statistics and on specific evidence relating to the discharge of two individual class members, Peter Guillory and John Haley.

During the discovery period of this litigation, PPG served Requests for Admissions on plaintiffs relating to the discharge issue.

These Requests were not denied or objected to by plaintiffs and were subsequent-

ly deemed to have been admitted by order of this court. These requests for admissions were admitted into evidence as PPG-Exh. 20.

The facts contained in PPG-Exh. 20, Items 52–63, having been admitted by the plaintiffs are hereby specifically found to be true.

 The court finds the reasons listed on Attachment E and F to PPG-Exh. 20 were in fact the true and correct reason for the termination of each individual listed. Race was not a factor in the termination of any individual terminated from PPG's employment from October 21, 1969 until July of 1978.

Class member John Haley testified he was discharged from his employment shortly before he was to graduate from the apprenticeship program. Mr. Frank Ludden, PPG's Industrial Relations Manager, identified records showing Mr. Haley was absent from work over 25% of the time he was employed (PPG-Exh. 180).

The records introduced as PPG-Exh. 180 also show and the court finds Mr. Haley was warned about his excessive absenteeism repeatedly before he was discharged. Mr. Haley admitted he had been warned about his excessive absenteeism.

Mr. Ludden testified that Mr. Haley was discharged because of his excessive absenteeism and his race was not a factor in the decision to discharge him.

Accordingly, the court finds the evidence establishes Mr. Haley was discharged for excessive absenteeism and that his race was not a consideration in the decision.

Class member Peter Guillory testified he was discharged from PPG after he was involved in an altercation with his supervisor.

Mr. Frank Ludden testified that he was a member of the disciplinary committee formed to consider the incident in which Mr. Guillory was alleged to have struck his supervisor.

Mr. Ludden testified that after investigating the incident, he and the other members of the committee concluded that Mr. Guillory had struck his supervisor. This was deemed by Mr. Ludden to be grounds for discharge. Mr. Ludden testified that Mr. Guillory was discharged because he struck his supervisor and that Mr. Guillory's race was not a factor in this decision. This is in accordance with the admissions made by the plaintiffs (PPG–Exh. 20, Attachment E) and is credited by this court.

The plaintiffs failed to offer any evidence tending to show this reason for discharge was pretextual or that any other employee had struck his supervisor and had not been discharged.

Accordingly, Mr. Peter Guillory was discharged because he struck his supervisor and his race was not a factor in the decision to discharge him.

Plaintiffs offered no evidence relating to alleged discrimination in the forced resignation of black employees.

The plaintiffs' pursuit of the allegation of discrimination in the discharge or forced resignation of employees is frivolous. This conclusion is based on the plaintiffs' (1) admissions as to the true and correct reason for the termination of each terminated employee from October 21, 1969 through July of 1978; (2) failure to produce any evidence regarding the forced resignation allegation and; (3) pursuit of only two individual instances of discharge, both of which involved obviously legitimate reasons for the discharge.

### CLAIM OF NOAH LEWIS

 The only named plaintiff who was not a member of the collective bargaining unit hourly paid work force was Mr. Noah Lewis.

Mr. Lewis is employed in the laboratory at PPG. His only timely complaint was that he had been denied a promotion to the instrument repair shop in the laboratory. Mr. Lewis alleged he was denied this promotion because of his race.

Mr. Lewis testified that he had expressed an interest in an instrument repair position, had applied for this position, and that the

position had been filled by another individual. Mr. Lewis failed to identify and demonstrate that he possessed the necessary qualifications or skills to be an instrument repair employee in the lab.

Dr. Hoenes, PPG's Laboratory Director, testified concerning the reasons he did not promote Mr. Lewis into the instrument repair position. Dr. Hoenes testified that Mr. Lewis was not qualified to fill this position because he did not have the necessary educational training nor experience to competently perform the instrument repair job. Dr. Hoenes further testified that every individual assigned to this instrument repair shop possessed formal education and experience at the time they were assigned.

Dr. Hoenes was aware at the time he decided not to place Mr. Lewis in the job that Mr. Lewis had taken and completed a radio TV electronics course. Dr. Hoenes testified that this was insufficient training for the job in question.

The court credits the testimony of Dr. Hoenes and finds that the company has proven a legitimate non-discriminatory reason for its refusal to promote Mr. Lewis, i. e., Mr. Lewis was not qualified for the job.

The court finds that race was not a factor in the decision not to promote Mr. Lewis and that Mr. Lewis was not the victim of racial discrimination.

## CONCLUSIONS OF LAW

### I. *JURISDICTION*

1. This court has jurisdiction of this case under the provisions of 42 U.S.C. 2000e et seq. and 42 U.S.C. Section 1981.

2. All procedural prerequisites for jurisdiction required under the provisions of Title VII have been met.

### II. *TIME PERIOD COVERED*

3. Under Title VII only those acts of discrimination occurring within 180 days prior to the date an individual filed a charge of discrimination with the Equal Employment Opportunity Commission are actionable. 42 U.S.C. § 2000e–5(e); *United*

*Airlines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

4. The actionable period covered by the instant case includes alleged acts of discrimination which occurred on or after October 21, 1974.

### III. *STANDARDS OF PROOF IN TITLE VII CASES*

5. In order to support a class claim in a Title VII case the plaintiff must do more than establish isolated instances of discrimination. Plaintiffs must show that discrimination was the regular rather than the unusual practice. *Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977); *Dickerson v. U.S. Steel Corp.*, 439 F.Supp. 55 (E.D.Pa. 1977) reversed on other grounds 582 F.2d 827 (3rd Cir. 1978).

6. Title VII requires the removal of artificial, arbitrary and unnecessary barriers to employment when these barriers operate insidiously to discriminate on the basis of race. Title VII prohibits not only overt discrimination but also practices which, although neutral on their face, operate without business purpose to segregate or classify by race. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

7. Generally the courts have recognized two methods of proving Title VII violations. The Supreme Court described these methods in *Teamsters v. United States*, 431 U.S. 324 at 335 n. 15, 97 S.Ct. 1843 at 1854 n. 15, 52 L.Ed.2d 396:

"Disparate treatment" ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. [Citation omitted.] Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII...

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another, and cannot be justified by business necessity . . . Proof of discriminatory motive, we have held, is not required under a disparate impact theory. [Citation omitted].

8. Plaintiffs have the initial burden in Title VII cases of making out a prima facie case of discrimination. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280; *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668.

9. In instances of alleged disparate treatment the factual elements required to prove a prima facie case will vary with the facts and circumstances of each case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

10. In instances of alleged disparate impact discrimination plaintiffs can establish a prima facie case in appropriate cases solely through the use of statistics which demonstrate gross statistical disparities between the employer's workforce and the relevant available pool of minority employees; *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Hazelwood Indep. School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Johnson v. Uncle Ben's Inc.*, 628 F.2d 419 (5th Cir. 1980), or alternatively that the employer's practices have resulted in a selection of employees in a racial pattern substantially different from the pool of relevant applicants. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

11. If plaintiffs are able to demonstrate a prima facie case of discrimination by showing disparate impact, the burden shifts to the employer to overcome this inference. This can be done by demonstrat-

ing the plaintiffs' proof was either inaccurate or insignificant; *Teamsters v. United States*, 431 U.S. 324, 358–361, 97 S.Ct. 1843, 1866–67, 52 L.Ed.2d 396, or by showing the disparate impact was caused by either a bona fide seniority system (*Teamsters*, 431 U.S. at 355–356, 97 S.Ct. at 1864–65) or a job related selection device (*Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280).

12. If the defendant shows the disparate impact is caused by a job related employment practice or selection device, the plaintiff can succeed by demonstrating that the employer could use other devices which would have a lesser disparate impact but would nevertheless serve the employer's legitimate business purposes. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

## IV. THE ROLE OF STATISTICS IN TITLE VII CASES

13. In appropriate cases, gross statistical disparities can, in and of themselves, constitute prima facie evidence of unlawful discrimination, and, absent explanation, justification, or rebuttal, can be grounds for a judgment in favor of the plaintiffs. *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Griggs v. Duke Power*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

14. Although Title VII does not require employers to hire minority groups in proportion to their representation in the population, 42 U.S.C. § 2000e–2(j), ordinarily it is expected that non-discriminatory selection practices will, over a period of time, result in a workforce more or less representative of the racial composition of the relevant population. *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

15. The court must be careful to examine statistical evidence, as it does any other evidence, to determine the proper weight it should be accorded. Statistical evidence comes in many forms and varieties. Like other evidence, it is to be given only such

weight as it logically deserves. *Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *Williams v. Tallahassee Motors, Inc.*, 607 F.2d 689 (5th Cir. 1979).

16. Further, the court must be careful when dealing with statistics not to allow what appear to the layman to be substantial differences to be controlling when statistical probability theory and expert analysis reveal the differences are not meaningful. Although the judicial decision is not to be controlled by the finite rules of statistical theory, neither are they to be ignored in evaluating the evidence. *Hazelwood Indep. School Dist. v. United States*, 433 U.S. 299, 308–311, 97 S.Ct. 2736, 2741–43, 53 L.Ed.2d 768 (1977).

17. In many Title VII cases, as in this case, courts are presented with two different types of statistical information. The first type exemplified by the statistical information contained in Plaintiffs' Exhibit 3 in this case (EEO–1 Reports) are known as "static" or "snap-shot" statistics. The second type, known as "flow" or "time frame" statistics are exemplified in this case by the analyses done by Mr. Ruch and introduced as PPG–Exhs. 195–201.

18. The time frame or flow statistics are generally preferable to the static or snapshot statistics. *Movement for Opportunity and Equality v. General Motors*, 622 F.2d 1235, 1245 (7th Cir. 1980).

19. Statistical evidence showing that the selection of employees for a given job or job group has not substantially excluded or adversely impacted on blacks (flow statistics) is sufficient to rebut a prima facie showing of gross disparities based on static statistics. *Movement for Opportunity and Equality v. General Motors*, 622 F.2d 1235 (7th Cir. 1980).

20. Moreover, snap-shot statistics incorporate discriminatory impacts occurring before the time period covered by this suit. Inclusion of this impact is not proper. *United Airlines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). *EEOC v. Local 14, Intern. Union of Op. Eng.*, 553 F.2d 251 (2nd Cir. 1977). The flow analysis which examines statistically the impact of decisions made during the period relevant to the lawsuit is a superior method of analysis, and is directly relevant to the issue in question. *Movement for Opportunity and Equality v. General Motors*, 622 F.2d 1235 (7th Cir. 1980).

21. In analyzing any selection procedure, whether it be hiring, assignment, or promotion, it is essential that the court compare the racial composition of those selected to the appropriate pool from which the selections are made. *Hazelwood Indep. School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Johnson v. Uncle Ben's, Inc.*, 628 F.2d 419 (5th Cir. 1980).

22. Comparisons of an employer's workforce or his selection practices to general population or general labor force availability figures is of questionable value when examining selection rates for jobs for which the general population is not presumptively qualified, *Hazelwood Indep. School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Hill v. Western Electric Co.*, 596 F.2d 99 (4th Cir. 1979).

23. In examining selection procedures which allegedly have had a disparate impact, the court must first determine whether the selection procedure in its entirety has resulted in a meaningful or substantial exclusion of blacks from the job opportunity in question. If there is no disparate impact in the overall process then there is no prima facie case of disparate impact discrimination. *EEOC v. Greyhound Lines, Inc.*, 635 F.2d 188, (3rd Cir. 1980); *EEOC v. Navajo Refining Co.*, 593 F.2d 988 (10th Cir. 1977); *Friend v. Leidinger*, 588 F.2d 61 (4th Cir. 1978); *Smith v. Troyan*, 520 F.2d 492 (6th Cir. 1975) cert. den. 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385; *Hester v. Southern Railroad Co.*, 497 F.2d 1374, 1381–1382 (5th Cir. 1974); *Brown v. New Haven Civil Service Board*, 474 F.Supp. 1256 (D.C.Conn. 1979). For a contrary view, *see Teal v. State of Conn.*, 25 FEP 529.

24. Evidence showing that selections are being made in a racial pattern which does

not vary substantially from the racial composition of the available relevant population suggests that the selection procedure is non-discriminatory absent evidence of intentional discrimination. *Brown v. New Haven Civil Service Board*, 474 F.Supp. 1256 (1979).

25. In the cases of *Hazelwood Indep. School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), and *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Supreme Court announced and utilized a statistical procedure to analyze the meaning of statistics in discrimination cases.

26. This procedure, a standard deviation analysis, uses probability theory to assist in determining the proper meaning to be given to relevant statistics.

27. In *Hazelwood Indep. School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the court found that if analysis of the relevant data shows that blacks have been selected for positions in a pattern which exceeds two to three "standard deviations" below that which could be expected to have occurred by chance, then the inference can be drawn that race was a factor in the selection process. 433 U.S. at 308 (1977) n. 14, 97 S.Ct. at 2742 n. 14.

28. If blacks are selected in a pattern which does not exceed two or three "standard deviations" below chance levels, then one cannot draw an inference from the statistical evidence that race was a factor in the selection process. *Hazelwood Indep. School Dist. v. United States*, 433 U.S. 299 (1977) at n. 17, 97 S.Ct. 2736 at n. 17, 53 L.Ed.2d 768.

## V. *SENIORITY SYSTEM*

29. Seniority systems which maintain the present effects of past discrimination are nevertheless lawful under the provision of § 703(h) of Title VII if they are "bona fide." *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

30. In determining whether a system is bona fide the court must consider all of the evidence relating to whether there was purposeful discrimination, including:

a. Whether the system applies equally to all races.

b. Whether the system is rational, in accord with industry practice, and consistent with NLRB precedent.

c. Whether the system had its genesis in racial discrimination.

d. Whether the system was negotiated and maintained free of any illegal purpose.

*United States v. Teamsters*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310 (5th Cir. 1977); *Swint v. Pullman Standard Co.*, 624 F.2d 525 (5th Cir. 1980).

31. In this case the record amply supports the conclusion that the system was adopted for significant business reasons, is essential for the safe and efficient operation of the plant, and is bona fide within the meaning of § 703(h) of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(h). Plaintiffs' allegations concerning the seniority system are without merit. PPG and Local 470 are entitled to judgment on this issue dismissing plaintiffs' claim.

## VI. *HIRING AND JOB ASSIGNMENT*

32. Concerning the statistical evidence concerning the racial composition of PPG's workforce, it is apparent that it is substantially comparable to the labor force and general population of the Lake Charles area. This suggests, and the court concludes, that there has been no gross disparity between PPG's workforce and the relevant population at any time covered to this action. Accordingly, plaintiffs' claim of hiring discrimination is found to be without merit. PPG is entitled to judgment on this issue dismissing plaintiffs' allegations.

33. In view of the evidence showing that blacks were assigned to the Utility Crew in numbers which exceeded the black availability in both the local Lake Charles labor market and in the Lake Charles general population; and evidence that blacks were not excluded from selection for vacancies in

the Utility Crew, the court finds there is no merit to the allegations that blacks were discriminated against by not being assigned to the Utility Crew. Accordingly, this allegation is dismissed.

34. In view of the evidence showing that blacks were assigned to the Service Mechanics in numbers which exceeded the black availability in the local Lake Charles labor market, and further, the evidence showing that blacks were not excluded from selection for vacancies in the Service Mechanic jobs, the court finds there is no merit to support the allegations that blacks were discriminated against by not being assigned to the Service Mechanic jobs. Accordingly, this allegation is dismissed.

35. There was no gross statistical disparity between PPG's technical workforce and the general workforce of the Lake Charles area. Defendant PPG proved that race was not a factor in the selection of technical employees. Accordingly, this allegation is dismissed.

36. In analyzing statistical evidence on the issue of exclusion from clerical positions, comparison to the general workforce is of little probative value. *Hazelwood Indep. School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Hill v. Western Electric Co.*, 596 F.2d 99 (4th Cir. 1979).

37. It is appropriate to compare the percentage of blacks in PPG's workforce to the percentage of blacks in the general Lake Charles area who possess clerical skills. *Hazelwood Indep. School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *EEOC v. Chesapeake & Ohio Ry.*, 577 F.2d 229 (4th Cir. 1978).

38. Plaintiffs failed to show any gross statistical disparity between the percentage of blacks in PPG's workforce and the black percentage of persons who possess clerical skills in the Lake Charles area. Defendant PPG proved that race was not a factor in the selection of clerical employees. Accordingly, this allegation is dismissed.

## VII. *TESTING*

39. Since the Supreme Court's landmark decision in the case of *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), it is well settled that the use of employment tests which, although neutral on their face, result in a disparate impact against blacks is unlawful under Title VII unless the tests can be shown to be job related by the employer.

40. In *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the court set forth the burdens of proof in cases of this nature:

> In *Griggs v. Duke Power Co.*, 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971) this court unanimously held that Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets 'the burden of showing that any given requirement (has) . . . a manifest relationship to the employment in question.' *Id.* at 432 [91 S.Ct. at 854]. This burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination, i. e., has shown that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668] (1973). If an employer does then meet the burden of proving that its tests are 'job related,' it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.' *Id.* at 801 [93 S.Ct. at 1823]. Such a showing would be evidence that the employer was using its tests merely as a 'pretext' for discrimination. *Id.* at 804–805 [93 S.Ct. at 1825] . . .

422 U.S. at 425, 95 S.Ct. at 2375.

41. In this case the plaintiffs failed to prove that blacks were selected for employment by the tests in a pattern which was significantly different than the black pool of applicants. This alone, shows the plain-

tiffs have failed to show a prima facie case of employment discrimination. *EEOC v. Greyhound Lines, Inc.*, 635 F.2d 188, 24 FEP 7 (3rd Cir. 1980); *Smith v. Troyan*, 520 F.2d 492 (6th Cir. 1975) cert. den. 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385; *Brown v. New Haven Civil Service Board*, 474 F.Supp. 1256 (D.C.Conn.1979).

42. Further, even if plaintiffs had proved a prima facie case of discrimination, PPG showed that its tests have a manifest and legitimate business relationship to the jobs for which the tests are used.

43. PPG showed that its tests are job related in that they serve to predict the job performance of persons applying for Utility Crew jobs. This showing was based on empirical evidence collected and analyzed in accordance with sound professional practices and the relevant and applicable provision of the Uniform Guidelines on Employee Selection Procedures. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

44. The Uniform Guidelines on Employee Selection Procedures issued by the Equal Employment Opportunity Commission are to be consulted on the technical issues of the demonstration of job relatedness but the court is not required to blindly apply them. Further, they are, as their name implies, guidelines not unbending regulations. *Guardians Assn. v. Civil Service Comm.*, 630 F.2d 79, 23 FEP 909 (2nd Cir. 1980).

45. To the extent the Uniform Guidelines on Employee Selection Procedures are in conflict with the sound professional opinion, they are not deemed controlling by the court. *United States v. South Carolina*, 445 F.Supp. 1094 (S.D., S.C.1977) (decided by a 3 judge panel) aff'd 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978); *General Electric Co. v. Gilbert*, 429 U.S. 125, at 140–143, 97 S.Ct. 401, at 410–411, 50 L.Ed.2d 343 (1976).

46. In *Albermarle Paper Company v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) the United States Supreme Court held that after an employer shows his tests are job related, the burden is on the plaintiff to show that the employer could use an alternative selection device to accomplish its legitimate business purposes and which would also have a lesser disparate impact against a given group of persons.

47. Subsequent to this decision the Uniform Guidelines on Employee Selection Procedures were issued. These guidelines purport to require an employer to study alternative selection procedures at the time a validation study is undertaken. Federal agencies cannot, through the guise of interpreting their own regulations or by issuing "guidelines," overrule decisions of the Supreme Court which interpret or apply to the same legal issue. *Cerro Metal Products v. Marshall*, 467 F.Supp. 869 (D.C.Pa.1979) aff'd 620 F.2d 964 (3rd Cir. 1980).

48. The court finds it was the plaintiffs' burden to show that there was an alternative selection device which was equally as job related as the Wonderlic and Bennett tests and which would have had a lesser disparate impact against blacks. The court finds as a matter of law that plaintiffs failed to prove there was an alternative procedure which was equally as job related as the Wonderlic and Bennett tests.

49. Plaintiffs' allegations of discrimination in testing are without merit both because PPG's use of the test has not resulted in discrimination against blacks and because PPG has shown the tests are job related and are justified by substantial legitimate business purposes. Accordingly, this allegation is dismissed.

VIII. *PROMOTION TO SUPERVISOR*

 50. Where, as here, the defendant company shows that it has promoted blacks to fill supervisory vacancies in numbers and percentages approximately equal to the availability of the *qualified* hourly workforce and that the qualifications it requires are essential to the safety and efficiency of the operation, there is no prima facie case of discrimination in promotion to supervisor. *Swint v. Pullman Standard*, 624 F.2d 525 (5th Cir. 1980).

51. Not all hourly workers have the skills, experience and abilities to be supervisors. The search for supervisors may rationally and appropriately be limited to the employees who do possess the requisite skills, experiences and abilities to be promoted to supervisor. *Hill v. Western Electric*, 596 F.2d 99 (4th Cir. 1979).

52. In this case PPG proved it is essential to the safe and efficient operation of the plant that supervisors of skilled hourly progression lines must have experience in and be familiar with the technical and complex chemical and maintenance operations over which they exercise supervisory control. PPG has not discriminated against blacks in denying them promotion to supervisory positions. Accordingly, this allegation is dismissed.

### IX. *PAY*

■ 53. Claims which allege blacks are paid less money than whites for performing similar work are cognizable under Title VII. In order to prove a violation of Title VII based on such a claim, the plaintiff must establish that blacks are paid a lower rate than whites who are performing jobs which require "substantially equal" skills, efforts and responsibility. *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (D.C.Cir.1976), cert. den. 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792.

54. Plaintiffs have failed to prove that any of the allegedly similar job groups (1. cell repair jobs—service mechanic jobs; 2. shipper jobs—loader jobs; and 3. swamper—rigger) in fact require substantially similar skills, efforts, abilities and responsibilities. Plaintiffs also failed to prove any individual claim of unequal pay. Accordingly, this issue is dismissed.

### X. *TRAINING*

55. Plaintiffs failed to prove that PPG discriminated against blacks by denying them entry into the apprenticeship program or by in any other way denying blacks training because of their race. Accordingly, this allegation is dismissed.

### XI. *DISCHARGE*

■ 56. It is unlawful to discharge an employee because of his race under Title VII and under 42 U.S.C. Section 1981.

■ 57. Allegations of discriminatory discharge are best analyzed under the disparate treatment analysis described by the Supreme Court in *McDonnell Douglas Co. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as opposed to the disparate impact analysis described in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

58. Based on the applicable disparate treatment standards as applied to discharge cases by the Fifth Circuit in *Turner v. Texas Instruments*, 555 F.2d 1251 (5th Cir. 1977), the court finds that the plaintiffs failed to prove a prima facie case of discriminatory discharge as to the class as a whole and also failed to prove a prima facie case of discrimination in the discharge of both Mr. Haley and Mr. Guillory. Accordingly, this issue is dismissed.

### XII. *CLAIM OF NOAH LEWIS*

59. The court finds Mr. Lewis established the following facts in support of his claim of racial discrimination in promotion:

a) He desired to be promoted to an instrument repair position in PPG's laboratory.

b) He communicated his desire to company officials.

c) Whites were hired and assigned to this position.

■ 60. However, in order to prove a prima facie case of individual employment discrimination under *McDonnell Douglas Co. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Mr. Lewis was also required to prove he was qualified for the position for which he applied. *Falcon v. General Tel. Co. of Southwest*, 626 F.2d 369 (5th Cir. 1980). Mr. Lewis failed to prove he was qualified for the job he desired and therefore, as a matter of law, failed to prove a prima facie case of discrimination.

61. Even if Mr. Lewis had proved a prima facie case of employment discrimination, the court finds PPG successfully rebutted this allegation by articulating and proving a legitimate non-discriminatory reason for its refusal to promote Mr. Lewis to the job he sought.

62. Accordingly, PPG is entitled to judgment on this issue dismissing Mr. Lewis' claims.

## XIII. *CONCLUSION*

63. The court having found that PPG and Local 470 are entitled to a judgment dismissing plaintiffs' claims it is hereby ordered that judgment herein be entered in favor of defendant PPG Industries, Inc., and Local 470 of the International Association of Machinists and Aerospace Workers, dismissing plaintiffs' case with prejudice at plaintiffs' cost.

The court orders that the defendants prepare the judgment in this case and submit it to the court within 10 days. Copies of the form of the judgment are to be sent to all parties in the case and they are to file any opposition they may have with the court within 10 days of their receipt of the judgment.